## BOARD OF ZONING APPEALS *v.* ALBERT McKINNEY

[No. 45, April Term, 1938.]

552

*Decided May 26th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Francis Ireton, Assistant City Solicitor,* with whom was *R. E. Lee Marshall, City Solicitor,* on the brief, for the appellant.

*Maxwell Suls,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On February 12th, 1937, one A. B. Himmelrich applied to the Buildings Engineer of Baltimore City, for a permit to erect a gasoline filling station and to construct for use in connection therewith three fifteen hundred gallon tanks, pumps, an office and other appurtenances, at the southeast corner of Fremont and Winchester Streets in Baltimore City. The Buildings Engineer referred the application to the Board of Zoning Appeals, which set it for hearing on February 23rd, 1937. In the meantime the Reverend Albert McKinney filed a protest against the issuance of the permit on the ground that the proposed filling station would be within three hundred feet from a church located at 1105 Winchester Street, of which he was the pastor. Mr. Himmelrich stated that he was surprised at the protest, and after some testimony had been taken the hearing was postponed to March 23rd, 1937. There was a public hearing on that day, evidence was taken, the parties were heard, and after the hearing the following resolution was proposed and carried by the unanimous vote of the five members of the Board of Zoning Appeals: "Resolved, that in the matter of Appeal No. 45-37 A. B. Himmelrich, 1136 W. North Avenue, Appellant, to permit the construction of a gasoline filling station at 1126 N. Fremont Avenue, the Board of Zoning Appeals, after giving public notice,

inspecting the premises, holding a public hearing, considering all data submitted, and by authority of Ordinance No. 318, approved January 16, 1937, an amendment to the Zoning Ordinance, made a study of the conditions on this lot and in the neighborhood, as well as the uses and buildings permitted under this Ordinance, and finds the location is at the southwest corner of Fremont Avenue and Winchester Street in a second commercial use, B area district. The Board disapproved the application for the reason that the proposed filling station would be within three hundred (300') feet of a church." On the same day Wallace MacWilliams, President of the board, notified counsel for the applicant and for the protestant that the application had been refused, and at the next meeting of the board that resolution, which had been regularly entered on its minutes, was approved and affirmed.

Mr. Fadum, counsel for Mr. Himmelrich, in that situation notified his client that his remedy was to appeal from the decision to the Baltimore City Court. But a few days later Himmelrich came to Fadum and asked him if it would be agreeable to him to withdraw from the case, as he, Himmelrich, "had another method he wanted to try."

Shortly after that on or about March 24th, Mr. Lee I. Hecht, a member of the Appeal Tax Court of Baltimore, called MacWilliams on the telephone, told him he was going to be interested in the case, asked him if "the action of the Board had been sent out," and was told that it had not. Hecht then wanted to know if it could be held, for the reason that there was going to be a change in the "occupancy of the property." MacWilliams referred him to Mr. Ireton of the city solicitor's office, and he later reported to Mr. MacWilliams that Mr. Ireton had said that "it would be all right not to send it out, in view of the fact there was going to be a change in the property."

On April 5th, 1937, after that conversation, Himmelrich leased from Samuel Levin the building in which the

alleged church was located, and, shortly after that, McKinney, who leased part of the building for church purposes, was notified to vacate the premises, which he did. He and his congregation, however, leased No. 1118 Winchester Street, which still left them within three hundred feet from the proposed filling station.

On April 5th, 1937, Hecht wrote to the Board of Zoning Appeals a letter in which in part he said: "Since this second hearing, the owner of the property supposed to be occupied for the supposed church, has issued a new lease for a store, and the supposed church has been eliminated. As the Board evidently considered this case only on the basis of that portion of the law which provided that no filling station can be erected within 300 feet of a church, and as the testimony apparently shows this situation, we feel that rather than to proceed further by legal steps, the Board is within its authority to re-consider the minutes of its previous meeting and set the case down for a re-hearing considering all the facts which will be presented."

On June 15, 1937, there was a hearing on that request, at the beginning of which Mr. Southey Miles, who had replaced MacWilliams, said:

"This hearing is to consider our right to re-hear the case. We have gone through the minutes and they disclose that an application was made earlier in the year and postponed once or twice, and subsequently the case was fully heard as of March 23, at which time the Board passed a resolution disapproving the application. At the next meeting of the Board the minutes of the previous meeting were read and ratified. We would be glad to hear you on anything you can give us to help us arrive at a conclusion.

"(Mr. Suls) May I see the petition upon which you are now proceeding to hear this case?

"(Mr. Miles) On application of counsel for the applicant to re-hear the case (presents letter to Mr. Suls). Who do you represent, Mr. Suls? A. I represent the protestants.

"Q. Who are the protestants? A. I am appearing for the church—the testimony shows that."

The Board decided to reconsider the case and held a further hearing on June 18th, 1937, when the application was approved and the permit granted. The protestants thereupon appealed to the Baltimore City Court, which, after a trial, reversed and annulled the order of the Board of Zoning Appeals. It is from that order that the Board of Zoning Appeals took this appeal.

The appeal submits these questions: One, had the Board of Zoning Appeals the right to appeal from the order of the Baltimore City Court; two, (a) was the decision of that Board of March 23rd, 1937, final; (b) if it was, had it the power to reopen and reconsider the case; and, three, did the partial use of the building for religious worship and instruction constitute it a "building or structure used as a church" within the meaning of that part of Ordinance No. 318 of the Mayor and City Council of Baltimore which reads as follows: "No building or structure of any kind shall hereafter be erected, altered or used for the sale of gasoline, or any other motor fuel, on any lot or premises where any of the boundaries of such lot or premises are within three hundred (300) feet of * * * any building or structure used as a church, orphanage, school, theatre or motion picture theatre in the City of Baltimore." Neither No. 1105 Winchester Street, nor No. 1118 Winchester Street, is a church building in the sense of being exclusively dedicated to purposes of religious worship and instruction. They are ordinary two story brick houses, originally erected for residential purposes, and converted to other uses as conditions made the change expedient.

The Reverend Albert McKinney is a colored minister affiliated with the United Holiness Church of America, who came to Baltimore from Asheville, North Carolina, some ten years ago, when he was sixteen years of age. He was first appointed a minister of that church in 1933 and several years ago he rented from the owner, Levin, for $2.75 a week, the front room of No. 1105 Winchester

Street, and established there a church called St. Paul's Holiness Church, and in the course of time a congregation varying in number from twenty-five to forty or more persons were attracted to the church and were accustomed to gather there for religious services. The room was furnished with a piano, forty or forty-five chairs, and other equipment ordinarily found in a place of worship. Religious services were held on Tuesday and Thursday evenings, on Sunday morning and on Sunday evening, and a Sunday school was conducted which was attended by some "ten or fifteen head of children." Other parts of the building were used for residential purposes, although that particular room had been used as a church for ten or fifteen years.

When the Reverend Albert McKinney and his congregation were evicted from No. 1105 Winchester Street, they moved across the street to No. 1118, where they rented the second floor of a similar building, the first floor of which is used for the storage of building material, and those premises were equipped and used by them in substantially the same way as was the room they occupied in No. 1105.

It appeared in connection with the second issue, whether the action of the board on March 23rd, 1937, was final, that according to the practice, after a case has been heard, the members of the board express their conclusions in the form of a resolution, the resolution is recorded in the minutes, and the secretary of the board then notifies the parties or their counsel of the result on a "blue slip" or "blue form". That form is ordinarily sent out as a matter of course, is merely a copy of the resolution, does not appear to be signed by the members of the board, and is a mere clerical detail.

In natural sequence the first question to be considered is whether the Board of Zoning Appeals has any right to appeal to this court from the order of the Baltimore City Court.

It is apparent from the record that this is an appeal by the Board of Zoning Appeals and not by the Mayor and City Council of Baltimore.

The Board of Zoning Appeals is an administrative agency of the City of Baltimore exercising *quasi* judicial and legislative functions, existing by virtue of a statute (Code [Supp. 1935] art. 66B) and an ordinance (Ordinance of the Mayor and City Council of Baltimore No. 1247, sec. 32). In addition to certain specific duties described below, it is charged with the duty of studying zoning: "The Board of Zoning Appeals shall study zoning and private municipal development, and shall from time to time, when it deems necessary submit amendments to this ordinance to the City Council." *Ibid,* subsec. k. Its primary and principal duty however is (1) to hear and decide appeals from the buildings engineer, (2) to hear and decide special exceptions to the terms of the Ordinance, and (3) to authorize upon appeal in appropriate cases a departure from the literal terms of the Ordinance.

"In exercising the above-mentioned powers, the Board may reverse or affirm, wholly or partly, or may modify, the order, requirement, decision or determination appealed from, and make such order, requirement, decision or determination as ought to be made, and, to that end, shall have all the powers conferred upon the Buildings Engineer by this ordinance." *Ibid,* sec. h.

Section 35 of the Ordinance makes, among others, these provisions for a court review of the Board's decisions: "(a) Any person or persons jointly or severally aggrieved by any decision of the Board of Zoning Appeals, or any taxpayer, or any officer, department, board or bureau of the municipality, may present to the Baltimore City Court a petition, duly verified, setting forth that such decision is illegal, in whole or in part, and specifying the grounds of the illegality. Such petition shall be presented to the court within thirty days after filing of the decision in the office of the Board.  *  *  *  The allowance of the appeal shall not stay proceedings upon the decision appealed from, but the court may, on application, on notice to the Board and the applicant, and on due cause shown, grant a restraining order. (c) The Board

of Zoning Appeals shall not be required to return the original papers acted upon by it, but it shall be sufficient to return certified or sworn copies thereof or such portions thereof as may be called for by such appeal. The return shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from and shall be verified. * * * An appeal may be taken from the determination of the Baltimore City Court to the Court of Appeals. (f) When such a petition as is provided for in sub-paragraph (a) of this Paragraph 35 is filed with the Baltimore City Court, the petitioner shall file a copy with the Board of Zoning Appeals. It shall be the duty of the Board of Zoning Appeals to notify the City Solicitor promptly of the filing of every petition of appeal. The Clerk of the Baltimore City Court shall notify the Board of Zoning Appeals of the final action of the Court on each appeal."

As originally passed, the Ordinance, by section 34, provided that a filling station use could only be permitted when authorized by an ordinance of the Mayor and City Council of Baltimore, passed after the notice required by section 5 of the Ordinance.

In 1937, Ordinance No. 318 of the Mayor and City Council of Baltimore, amending section 34 of Ordinance 1247, and adding two new sections to that Ordinance, and repealing inconsistent local enactments, was adopted. As a result of the amendment, the right to determine for what locations and under what circumstances filling station permits should be issued was transferred from the legislative body of the city, the Mayor and City Council, to the Board of Zoning Appeals. The Ordinance however placed this limitation upon its powers: "but said Board of Zoning Appeals shall not consider or approve an application for a permit within two years after the rejection of an application for a similar permit for the same premises."

Section 34 A of the amending ordinance provides that an application for such a permit shall be made to the Buildings Engineer, but he is not authorized to issue it

until it is approved by the Board of Zoning Appeals, and he is accordingly required to transmit forthwith any such application filed with him to that Board, together with the requisite drawings, plans and specifications appertaining thereto. Upon receipt of them that Board must require the applicant to post the premises and advertise in accordance with its rules and regulations, and the Board is required to submit to the Board of Fire Commissioners, the Commissioner of Health, the Police Commissioner and the Chief Engineer of the City drawings, plans, specifications, and any other data it may have concerning the application.

Section 34 B provides that the Board shall then fix a reasonable time for the hearing, and give due notice to the parties in interest, and "shall hold a public hearing, giving all parties in interest the right to testify as to any material facts in connection with the proposed use, and shall act as the fact-finding body and shall approve or disapprove the issuance of the permit for the proposed use in accordance with the evidence adduced before it and from its own investigation as to whether or not such proposed use would menace the public health, safety, security or morals." It further provides as a guide to their decision upon the facts they shall give consideration to various factors which are enumerated in careful and meticulous detail.

From these statutory provisions it is apparent that the Board is a type of those administrative agencies which necessarily play so large a part in the operation of government under modern conditions, the function of which is to ascertain and determine ultimate facts upon which the legislative will is to operate. Such a function involves the exercise of discretion, and judgment, and is in its nature judicial. It grants or withholds highly valuable privileges accordingly as it from evidence finds the existence of facts which justify one course or the other. It has no executive duties, it formulates no policies, its function is merely to find facts, to apply to those facts rules of law prescribed by the Legislature, and to

announce the result. It has no interest, personal or official, in the matters which come before it other than to decide them according to the law and the proved fact, and it is in no sense a party to such proceedings.

It is suggested in the brief of the appellant that it is a party because "it is required to file a return to said court, which in effect is an answer to the petition," but there is nothing either in the ordinance or the Enabling Act (Code [Supp.] art. 66B, sec. 7) to support that conclusion. The only return which the Board is required to make is to transmit to the Baltimore City Court the original papers filed in the case, or certified copies thereof, and such other data as may be material and pertinent to "show the grounds of the decision appealed from," which must be verified. The only possible purpose of that provision is to provide a method for placing in the possession of the Baltimore City Court the papers and data upon which the Board acted, in order that the court may be informed of the nature of the question to be tried. It is true that the statute and the ordinance provide that a return must be "made and served upon the relator's attorney" (by "relator" petitioner is apparently meant), but by "return" obviously nothing more is meant than an adequate transcript of the proceedings before the Board. There are administrative boards and agencies, such as the State Tax Commission and the Public Service Commission, the functions of which are so identified with the execution of some definite public policy as the representative of the State, that their participation in litigation affecting their decisions is regarded by the Legislature as essential to the adequate protection of the State's interests. But in such cases it will be found that the Legislature in clear and unmistakable language has conferred upon them the right, and charged them with the duty, of taking a part in such litigation. Code, art. 23, secs. 404, 407, art. 81, sec. 253.

This was not regarded by the Legislature as such a board, for in the legislation concerning it, no provision is found authorizing it to defend its own decisions on

appeal or to take part in litigation concerning them. Obviously section 35 of the ordinance and section 7, Code (Supp.) art. 66B, authorizing "any person * * * aggrieved by any decision of the Board or any * * * board" to appeal from its decisions has no application to this Board, for in such cases the appellant must file a petition alleging that the decision is illegal, a statement which the Board itself could not reasonably be expected to make.

The Board is wholly a creature of statute, it has no powers, rights or duties save those conferred by statutes and such as are implicit in its granted powers, and its nature and character preclude the hypothesis that the Legislature intended that it should have the power to engage in litigation involving the legality or propriety of its decisions.

Apart from legislative authority, it would seem clear that the Board has no more right to appeal from its own decisions to the Baltimore City Court, or, from the decisions of that court to the Court of Appeals, than a justice of the peace, or such an agency as the State Industrial Accident Commission, would have to appeal from judgments of a court reversing their decisions.

Attention is called to *Baltimore v. Linthicum,* 170 Md. 245, 183 A. 531, where it is said an appeal taken by the Board of Zoning Appeals was not dismissed but considered by this court. But that is not quite accurate. The appeal there was taken by the Mayor and City Council and the Board of Zoning Appeals. The Mayor and City Council was a party to that proceeding, it was authorized to appeal (Code Pub. Loc. Laws 1930, art. 4, secs. 62, 66), no motion was made to dismiss the appeal of the Board of Zoning Appeals, and in view of the fact that there was but one order to appeal from, such a motion would have been captious. Moreover, apart from statute, the general rule is that a municipality has the same right to appeal as any other litigant. 4 *C. J. S., Appeal and Error,* 386, sec. 205.

That is not true of judicial and *quasi* judicial officers

and boards (4 *C. J. S., Appeal and Error*, 389, sec. 205, for, as stated in 3 *C. J.* 660: "As a general rule a court or board exercising judicial or *quasi* judicial functions, not being a party to its proceedings, and not having any legal interest in maintaining its determination, can neither appeal from a judgment or order of a court reversing the proceedings nor be heard on the appeal." Supporting that text are *People v. Lawrence*, 107 N. Y. 607, 15 N. E. 187, where the relator was arrested on a warrant issued by a police magistrate, and was, upon *habeas corpus* before Judge Lawrence, remanded to custody. On the application of the prisoner, the Supreme Court allowed a writ of *certiorari*, and directed Judge Lawrence to return to that court the record of the *habeas corpus* proceedings. He did so, his order was reversed, and the prisoner discharged. He then appealed. The court, in dismissing his appeal, said: "The appellant is Abraham R. Lawrence, not as an individual, but in his judicial character as a 'justice of the supreme court.' He was styled defendant in the court below in that character only, and the object of the proceedings in the general term was to procure a reversal of an order made by him in his judicial capacity. We are unable to discover that he had an interest in maintaining the order, or that it affects any right peculiar to himself"; *McCarty v. Board of Supervisors*, 61 Wis. 1, 20 N. W. 654, where a county board of supervisors appealed from an order of a court of record reversing its order removing a county clerk. In dismissing that appeal the Court said (page 655): "The board of supervisors have no more right to appeal from the order or judgment of the circuit court than a justice of the peace would have to appeal from a judgment of the same court reversing one of his judgments on *certiorari*"; *Appeal of Lansdowne Borough Board of Adjustment*, 313 Pa. 523, 170 A. 867, where the Board appealed from an order of the lower court reversing its decision. In quashing the appeal the court there said (page 868): "It is clear, however, that the board of adjustment, as a board, has not been, and cannot be, in-

juriously affected by the order, and hence has no standing to appeal. It might just as well be claimed that an auditor or master could appeal from a decree of the court sustaining exceptions to his report." See also 2 *R. C. L.* 52; *State Tax Commn. v. Baltimore County,* 138 Md. 668, 672, 114 A. 717; 3 *C. J.* 658; 4 *C. J. S. Appeal and Error,* 387, sec. 205.

Since therefore the Board is not a party to this proceeding, has no interest in it different from that which any judicial or *quasi* judicial agency would have, which is to decide the cases coming before it fairly and impartially, is in no sense aggrieved by the decision of the Baltimore City Court, and has no statutory right of appeal, it had no power to take this appeal, and the appeal must be dismissed.

Because of that conclusion, the second and third questions stated become moot, but, following the course followed in *State Tax Commn. v. Baltimore County, supra,* and the directions found in Ordinance No. 318 of the Mayor and City Council of Baltimore, section 34 B, that the Board shall be guided by the decisions of this court, it is considered expedient to express our views on those questions.

2. It may be conceded without discussion that the Board has the right to correct errors in its decisions caused by fraud, surprise, mistake or inadvertence, which any agency exercising judicial functions must have, to adequately perform its duties. Whether it has the right to reconsider its decision in a case which it has heard and decided, reopen the case and try it again, where there is no fraud, mistake, surprise, or inadvertence, is another question. In dealing with that question, the first issue is whether in fact the Board did on March 23rd, 1937, finally decide the case. As to that there can be no substantial doubt. It adopted by a unanimous vote a resolution refusing the permit, and denying the petition, which was duly entered on its minutes and counsel for the parties duly notified of its action, and at a meeting held a week later it formally adopted another resolution

ratifying and approving its resolution of March 23rd. It had done all that it could do to finally dispose of the application, and the only thing that could have been done which was not done was the transmission on a blue slip or form of a copy of the resolution of March 23rd to the parties in interest. That, however, was not the action of the Board, but evidence of its action. It could have conveyed no more or different information to counsel for the parties than did the oral statement of Mac-Williams.

It is suggested, however, that in the time which had elapsed between the decision of the Board and its formal reconsideration of it the conditions had changed, since the building said to have been used as a church was occupied by another tenant and no longer so used. But when Hecht called up MacWilliams on March 24th, he expected to be, but in fact was not, then retained as counsel for Himmelrich, and Himmelrich did not lease the building until April 5th, 1937. So that at the time Hecht asked MacWilliams to hold back the notice of the decision there had been no change in conditions. Moreover, the protestant, after that change, acquired another site for the church, which is also within three hundred feet from the proposed station, the use of which was, for the purposes of this case, identical with the use of the building at 1105 Winchester Street, so that, while the precise location of the church had changed, the reason for the refusal of the application on March 23rd, the proximity of the church, remained unchanged.

Upon those facts the rule seems to be that the Board lacked the power to reopen and reconsider the case. *Burr v. Rago*, 120 Conn. 287, 180 A. 444, 447, 3 *C. J.* 356; *St. Patrick's Church Corp. v. Daniels*, 113 Conn. 132, 154 A. 343. That rule is stated in 43 *C. J.* 356 in these terms: "When the board of appeals is considered a quasi-judicial tribunal, the general rule is that such a board is not vested with the power to reopen and rehear a proceeding which has once been terminated, at least in the absence of mistake in the prior proceedings." The reason for it,

as stated in *St. Patrick's Church Corp. v. Daniels, supra* (page 345), is that: "Otherwise there would be no finality to the proceeding; the result would be subject to change at the whim of members or due to the effect of influence exerted upon them, or other undesirable elements tending to uncertainty and impermanence. *People ex rel. Swedish Hospital v. Leo,* 120 Misc. 355, 198 N. Y. S. 397; *People ex rel. Brennan v. Walsh* (Sup.) 195 N. Y. Supp. 264; *Baker, Legal Aspects of Zoning,* p. 92. However, the power to reopen 'should not be interpreted with too much refinement nor should it be hedged about with technicalities if, in the meantime, no rights have arisen which would be injured.' *Metzenbaum, Law of Zoning,* p. 264. 'Great difficulty might be experienced by a hard and fast rule of law denying permission to rehear and modify (the board's) rulings; that is to say, in correcting matters which were overlooked and were of slight materiality, but which were capable of speedy and practical correction * * * without prejudice to the rights of any one. * * * But the power to reconsider is not an arbitrary one and its exercise should be granted only when there is justification and good cause.' *People, ex. rel. Brennan v. Walsh, supra,* 195 N. Y. Supp. [264] 266; *McGarry v. Walsh,* 213 App. Div. 289, 210 N. Y. Supp. 286; *Barker v. Boettger,* 124 Misc. 461, 208 N. Y. Supp. 295; 43 *Corpus Juris,* p. 356."

The action of the Board therefore in reopening the case was beyond its powers, and void.

3. The final question is one of some difficulty. Ordinance No. 318 prohibits the use of any building or structure for the sale of gasoline within three hundred feet of any "building or structure used as a church * * * ." Under any definition of the term, a part of the building formerly occupied by McKinney's congregation was used as a church, and a part of the building which it now occupies is so used. *Oxford Dict.;* 11 *C. J.* 762. But it is not clear that a building partly used as a church and partly used for residential or commercial purposes is "a building used as a church." The reason for the prohibition would

seem to be the same in both cases, protection of the congregation of the church against the hazards assumed by the ordinance to be incident to the operation of a filling station. So that if the phrase "building used as a church" can be interpreted in the light of the reason for the rule, it could mean any building in which a church is located, whether the church occupies the whole or only a part of the building. But where the language of the ordinance is clear there is no room for construction.

Such facts as that the congregation is small, or that it lacked funds to secure more adequate accommodations, would not justify construing the ordinance so as to withhold from it the protection afforded to other congregations whose resources enable them to secure for their services an entire building, if any other construction is possible. But it is not. The word "used" is unqualified, and when one speaks of a building, ordinarily he means the entire building and if he means to refer to but a part of it he indicates by some qualifying words that he refers to less than the whole. Moreover, it can not be reasonably assumed that, when the Ordinance prohibited the location of a filling station within 300 feet of a building used as a "school" or a "church," it was intended to apply to a part only of a building in which a few persons were accustomed to gather for academic or religious instruction. And yet if "building" means anything less than a whole building, there is no standard to guide the Board in determining how much or how little must be so used as to bring it within the scope of the ordinance. Since therefore the ordinance refers not to a building in which a church is located, but to a building used as a church, the conclusion seems unavoidable that it means a building wholly dedicated to purposes of religious worship.

It follows, from what has been said in connection with the right of the Board to appeal from the order of the Baltimore City Court, that this appeal must be dismissed. The motion to dismiss must therefore be granted.

*Appeal dismissed, with costs.*