772 A.2d 1209

**CALVERT COUNTY PLANNING COMMISSION,**

v.

**HOWLIN REALTY MANAGEMENT, INC.**

No. 61, Sept. Term, 2000.

Court of Appeals of Maryland.

June 4, 2001.

304

John A. Yacovelle, St. Leonard, on brief, for petitioner.

Robert L. Gray, Prince Frederick, on brief, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

WILNER, Judge.

The two issues before us are (1) whether the Calvert County Planning Commission was a proper party in the Circuit Court for Calvert County, in an action for judicial review of the Commission's decision to rescind a subdivision approval it had granted three years earlier, and (2) whether the Commission provided due process to the owner of the subdivided lots in the hearing that it conducted on the matter. The Court of Special Appeals answered the first question in the affirmative and the second in the negative. We shall answer both in the affirmative and therefore reverse the judgment of the intermediate appellate court.

## BACKGROUND

The Calvert County Planning Commission was created in 1962, pursuant to the provisions of Article 66B of the Maryland Code. Among the powers vested in the Commission by that Article is the power to approve or disapprove subdivision plats. See §§ 5.01, 5.02, 5.04 of Article 66B.

We are concerned here with the Hickory Creek Subdivision, which was created in 1993 by Claudette McLaughlin, William McLaughlin, and Eva Roth. The preliminary plan, approved by the Commission in August, 1993, showed a 93–acre subdivision divided into 43 lots, with 50% open space and three separate recreation areas. The approval included a number of conditions, one of which stipulated that 3.931 acres of recreation area be provided pursuant to then-current § 5.83 of the

Calvert County Subdivision Regulations and that those recreation areas be dedicated to the lot owners of the proposed subdivision. In October, 1993, six final plats were approved by the Commission and recorded among the land records. Plat One contained Recreation Area A, consisting of 0.662 acre; Plat Two contained Recreation Area B, consisting of 1.643 acres; and Plat Six contained Recreation Area C, consisting of 1.626 acres.

In August, 1994, all of the lots in the subdivision, exclusive of roads, recreation areas, and common areas, were deeded to Edward Howlin. The McLaughlins and Roth continued to own the three recreation areas. Four months later, the county adopted a Recreational Fund Ordinance, which allowed developers of subdivisions containing less than 50 lots to pay a recreational fee to the county in lieu of providing on-site recreation areas. In July, 1995, the McLaughlins and Roth applied to convert the platted recreational areas into residential lots by paying the recreational fees provided for in the ordinance, in accordance with the revised provisions of § 5.83 of the Subdivision Regulations. The Commission granted the request, subject to the condition that re-subdivision of the recreation areas conform to the county subdivision requirements.

In September, 1995, Randy Barrett, a surveyor with the firm of Hugh W. Wilkerson & Assoc., filed an application with the Department of Planning and Zoning, on behalf of the owners of the three recreation lots, to convert Recreation Area A into one building lot and to subdivide Recreation Area B into three building lots. Recreation Area C would remain as an undeveloped recreation area. Although the subdivision regulations in effect at the time are not in the record before us, the parties agree that those regulations required, as a condition of approval, that the owners of all lots in the Hickory Creek Subdivision consent in writing to the conversion of Recreation Area A and the re-subdivision of Recreation Area B. By that time, Howlin had sold a number of the building lots to other people. Barrett's letter noted that some lots had already been conveyed and that others were under contract,

but he asserted that "[i]n each case an agreement was signed by the lot owners and contract purchasers acknowledging that they were aware that the recreation area would be subdivided into buildable lots" and that "[c]opies of all of the agreements are included with this application." He stated that, because the lot owners and contract purchasers had no actual ownership interest in the recreation area, their signatures did not appear on the subdivision application, but that "their signed acknowledgments of the owner/applicants intent is provided in the agreements."

On April 17, 1996, without any apparent opposition, the Commission approved the application to re-subdivide Recreation Area B into three new building lots—Lots 44, 45, and 46. A year later, those lots were sold to Howlin Realty Management, Inc. (HRM). Soon thereafter, several of the residents noticed Recreation Area B being staked for building lots and made inquiry of the Commission, complaining that they had never consented to the re-subdivision of that area. The Commission staff responded in August, 1997, that "the required documentation was provided with the preliminary plan submission package" and that the documentation "was reviewed and deemed adequate."

In September, 1997, John Jones, an attorney retained by two of the residents, Mr. and Mrs. Bennett, informed the Commission that, in response to the August letter, he had inspected the Commission file and found that, although there were some written consents to the conversion of Recreation Area A, there were none to be found regarding the re-subdivision of Recreation Area B. The Bennetts, he said, had reviewed their own files and had not located any documents indicating their consent to the re-subdivision of Recreation Area B. The attorney further advised that, while at the Commission office, a call had been placed to Mr. Wilkerson's office, asking that Mr. Barrett review his file for the missing consents, and that no response had been forthcoming. Jones asked that his letter be treated as a formal request that the Commission (1) void or set aside the re-subdivision plat of Recreation Area B, based on the failure to provide evidence of

the consent of all parties whose interest in that area vested prior to the submission, and (2) refrain from issuing any building permits on the lots created by the re-subdivision plat. At Jones's request, the Commission scheduled a hearing on the matter for the evening of October 15, 1997.

On the morning of the 15th, HRM filed an action in the Circuit Court for Calvert County to enjoin the proceeding. The record in that case is not in the record now before us, but it appears that, among other things, HRM complained that (1) the Commission had no authority to reopen the matter, the Bennetts only remedy having been to seek judicial review of the initial decision, and (2) it was likely to be denied due process because it was not aware of how the Commission intended to proceed, in part because the Commission had failed to adopt any rules that would govern the proceeding. The court denied the requested injunction.

At the commencement of the hearing later that evening, counsel to the Commission attempted to deal with some of the procedural issues. He advised the Commission that, because the previous approval was presumed to be valid, the burden would be on the Bennetts to prove otherwise, to show that there was some fraud, mistake, or irregularity in the approval in that required written consents had not been obtained. He observed that, if the Commission were so to find, it might then have to deal with the rights of any intervening bona fide purchasers of the re-subdivided lots. Counsel told the Commission that "fair play has to be accorded to everyone"—that there was no rule book, but that there were requirements of "fundamental fairness in due process of law." Witnesses, if any, were to be sworn, and would be subject to direct and cross-examination. HRM asked the Commission not to proceed because it was unaware of what the procedure would be—whether the hearing would be informal or involve the taking of evidence—and that "we have no clue as to what's going on." He complained again that the Commission had failed to adopt regulations or rules of procedure and that the Commission had no authority to reopen the matter. In response to a formal request from HRM, the Commission deter-

mined that it intended to conduct an evidentiary hearing on the merits of the issue and would first hear from Mr. Jones, counsel for the Bennetts.

Prior to any testimony, the relevant plats and Mr. Barrett's letter were placed into evidence, along with several deeds and agreements that were found in the Commission's file. The deeds were for the conveyance of lots in the Hickory Creek subdivision to Gilchrist and Dredger, Johnson, Stone, Dickerson, and the Bennetts. The agreements were from Gilchrist, Dredger, and Dickerson, each of whom consented to any future subdivision of Recreation Area *A*. John Bennett testified that he and his wife purchased Lot 23—three lots away from Recreation Area B—in July, 1995, that he had no recollection of ever consenting to a re-subdivision of that Area, and that, although he asked about that area during the contract negotiations, he did not recall any discussion about Recreation Area B being re-subdivided. Bennett acknowledged that it was possible that one of the several documents he signed at settlement was a consent to the re-subdivision of Recreation Area B, but he said he had no recollection of any such document and that it was not discussed. Mrs. Bennett gave similar testimony. Mr. Dickerson identified his deed, conveying Lot 38 to him in March, 1995, and his agreement consenting to the re-subdivision of Recreation Area A, but testified that he never consented to the re-subdivision of Recreation Area B. Like the Bennetts, he acknowledged that it was possible that, among the various documents he signed, there was a consent regarding Recreation Area B.

Frank Jaklitsch, the Secretary to the Commission, advised that the staff does not check to see if all required consents are obtained but usually relies on the owner's representation: "when they come in, and they represent and they're saying that they got everybody agreeing to this, we take them on their face value." Mr. Barrett, the author of the application, stated that he did not, himself, collect the signatures. Rather, he said, representatives from one of the Howlin entities, in the person of one John Weeks, "were in charge of getting the signatures on those forms." Barrett never met with the lot

owners and could not state whether a consent had ever been obtained from the Bennetts or from Dickerson. He added that he would never intentionally submit an incorrect document to the Commission. In response to Mr. Barrett's testimony, Mr. Bennett and Mr. Dickerson stated that no one, including John Weeks, ever approached them with regard to Recreation Area B. At that point, the hearing was continued until February 18, 1998, supposedly to allow HRM time to prepare further cross-examination.

When the hearing reconvened, HRM waived further cross-examination but renewed its motion to dismiss the proceeding on the grounds that no regulations were in effect making clear that the Commission had authority to reopen the matter or specifying the procedure to be followed. A particular complaint in that regard was that it was uncertain whether the Bennetts were required to prove their case by clear and convincing evidence or only by a preponderance of the evidence. When that motion was denied, HRM made another, based on an alleged insufficiency of Mr. Jones's letter to state a cause of action; it too was denied.

Mr. Jaklitsch, recalled by HRM, testified that Travis Clark was the Commission employee who reviewed the application in question and that he was a very diligent person who would not process an application that was not fully documented. Jaklitsch again noted, however, that the staff had "no real way of checking to see that all of the owners have signed it" and that Clark "would have to take the surveyor or applicant's word." He could verify that the owners had signed the consents submitted but not whether consents had been obtained from all of the owners. Michael Rodevick, an engineer with a company called Advanced Surveys, testified that he had been asked to resubmit documents previously submitted to the Commission, the inference presumably being that the Commission had misplaced the original documents. Mr. Barrett testified that he had searched through his files and had been unable to locate either a copy of the letter he had sent to the Commission or copies of any attachments to that letter. He, too, stated that he had been asked to resubmit documents to

the Commission. The last item taken up was a dispute over the standard of proof required of the Bennetts: HRM contended that the standard was clear and convincing evidence; the Bennetts asserted that, whatever the standard was, they had met it. The Commission did not announce any decision on that issue.

The Commission met again on the matter on March 18, 1998, at which time a motion was made and carried to rescind the earlier approval, based on a finding that one or more of the homeowners had not given the required consent. Nothing was said by any of the Commissioners about the standard of proof or about any fraud; they all simply said that their decision was based on their conclusion that the consents had not been given. Counsel to the Commission added, after announcement of the result, that "based on that factual finding, that the board has made, that the prior approval was based on a misrepresentation of fact, whether intentional or negligent isn't important for this purpose, but a misrepresentation of which, in a general sense, provides a ground for you to revoke the prior decision." He added that, "[i]n a general sense, it amounts to fraud, although I had indicated to you, it's not criminal fraud, or civil fraud, but a misrepresentation." Counsel agreed to prepare a written document, although he advised that the motion just granted was effective.

On April 17, 1998, the Commission approved a formal resolution, presumably prepared by its attorney, in which, after reciting some of the procedural history, it found as facts that: (1) "[a]ll of the property owners within the subdivision did *not* consent to the creation of a Transfer Zone, as required for the subdivision of Recreation Area B," (2) the September, 1995 letter from Barrett contained "a misrepresentation of a material fact, *i.e.*, that all owners had, in fact, consented," that although that misrepresentation may well have been negligent rather than intentional, arising out of misplaced reliance on Mr. Weeks, it nonetheless was relied on by the Planning & Zoning staff and by the Planning Commission in approving the re-subdivision, (3) the approval was therefore caused by misrepresentation constituting fraud within the meaning of *Zon-*

*ing Appeals Board v. McKinney,* 174 Md. 551, 199 A. 540 (1938) and *Schultze v. Montgomery Co. Bd.,* 230 Md. 76, 185 A.2d 502 (1962), and (4) there were no intervening rights of innocent third parties. Upon those findings and conclusions, it was resolved that the approval of the re-subdivision of Recreation Area B be rescinded and revoked.

HRM sought judicial review of that ruling in the Circuit Court for Calvert County. Both the Commission and the Bennetts opposed HRM's petition and indicated their intent to participate in the proceeding. Relying largely on *Zoning Appeals Board v. McKinney, supra,* and *Howard County v. Mangione,* 47 Md.App. 350, 423 A.2d 263 (1980), HRM moved to strike the Commission as a party on the ground that it had no standing to be a party to the review of one of its "quasi judicial decisions." The Commission responded that the *McKinney* doctrine had been limited to agencies exercising *only* quasi-judicial functions, which was not the case with the Commission, and that, in any event, *McKinney* and *Mangione* merely precluded an agency from appealing a judgment of the Circuit Court reversing its decision, not from being a party in the Circuit Court.

The Circuit Court was not impressed with the Commission's response and entered an order striking it as a party. That victory proved to be a hollow one for HRM, however, as the court later affirmed the Commission's decision on the merits. The Court concluded that proceeding in the absence of adopted rules presented no due process violation, as urged by HRM, and that a finding of fraud justified the Commission in reopening and rescinding its earlier approval.

The Court of Special Appeals, as noted, reached exactly opposite conclusions, holding that (1) the Commission was a proper party to the Circuit Court action, but (2) it had not afforded HRM due process of law. The first holding was premised on a finding that the Commission was not acting solely as a quasi-judicial body but had a strong public policy interest in the integrity of its subdivision approval. As to the due process claim, the intermediate appellate court held that,

although the lack of written rules of procedure alone did not suffice to constitute a Constitutional violation, the lack of clarity up front regarding the standard of proof did have that effect. In that regard, the court held that "[a]s a party to the hearing, Howlin was entitled to know what facts the property owners needed to prove to obtain a revocation of the resubdivision approval and the measure of proof by which they were required to prove those facts."

We granted the Commission's petition for *certiorari* to determine whether the Court of Special Appeals erred in concluding that it had violated HRM's due process rights, and we granted HRM's petition to determine whether that court erred (1) in concluding that reversal was not justified by the Commission's failure to adopt written regulations or rules of procedure, and (2) in holding that the Commission was a proper party in the Circuit Court.

## DISCUSSION

### *Standing of the Commission*

HRM's objection to the standing of the Commission in the Circuit Court stems from this Court's pronouncements in *McKinney, supra,* a case, as we shall see, that has a dual significance in this appeal. In *McKinney,* the Baltimore City Board of Zoning Appeals denied an application for a permit to build a service station because the station would be located within 300 feet of a "building or structure used as a church," which the zoning law prohibited. The church in question was located in the front room of a building that also contained a number of residential apartments. After the board made its decision, but before written confirmation of it was mailed to the parties, the applicant leased the building in which the church was located and evicted the church. He then asked the board to reconsider its denial of the application, asserting that the impediment no longer existed. In fact, the impediment remained, as the church rented space in a loft across the street and was still within 300 feet of the proposed service station. The board, with new members, nonetheless, *did*

reconsider its action and, reversing its earlier view, concluded that neither building was a "building or structure used as a church," within the meaning of the zoning ordinance, and therefore entered an order approving the application.

The pastor of the church, McKinney, sought judicial review, naming as defendants the board and the building engineer. The applicant was permitted to intervene. After an evidentiary hearing, which was permitted under the then-current statute, the court reversed the board's decision, holding (1) that the buildings *did* constitute buildings used as a church, in that the religious use was not required to be an exclusive one, and (2) that the board had no authority to reopen the matter after having finally decided the issue. The board, which, as noted, was a named party in the Circuit Court, noted an appeal to this Court. McKinney moved to dismiss that appeal on the ground that the statute allowed only a party aggrieved by the court's judgment to appeal and that the board could not be aggrieved by the reversal of its decision. The only person aggrieved, he argued, was the applicant, who had not joined the appeal.

This Court found merit in that motion and dismissed the appeal. Although noting that the board exercised both quasi-judicial and legislative functions, we concluded that its principal duties were to hear and decide appeals from decisions of the building engineer and determine whether to grant special exceptions and variances. After examining the laws governing its jurisdiction and operation, we concluded that the board "has no executive duties, it formulates no policies, its function is merely to find facts, to apply to those facts rules of law prescribed by the Legislature, and to announce the result," and that, accordingly, "[i]t has no interest, personal or official, in the matters which come before it other than to decide them according to the law and the proved fact, and it is in no sense a party to such proceedings." *McKinney, supra*, 174 Md. at 560–61, 199 A. at 544.

We observed that there *were* some administrative agencies, such as the Public Service Commission and the former State

Tax Commission, "the functions of which are so identified with the execution of some definite public policy as the representative of the State, that their participation in litigation affecting their decisions is regarded by the Legislature as essential to the adequate protection of the State's interests," but that, in those instances, the Legislature, by "clear and unmistakable language," had conferred on them the right and duty to take part in such litigation. *Id.* at 561, 199 A. at 545. The zoning board, we held, was not such an agency, as no provision existed in the legislation authorizing it "to defend its own decisions on appeal or to take part in litigation concerning them." *Id.* at 561–62, 199 A. at 545. It had no more right to appeal than a justice of the peace or Worker's Compensation Commission would have to appeal from the reversal of one of its decisions.

The holding in *McKinney,* and its conceptual underpinning, held sway in this Court for more than 40 years, being confirmed in numerous cases. *See, for example, Roeder v. Brown,* 192 Md. 639, 65 A.2d 333 (1949); *Md. Pharmacy Board v. Peco,* 234 Md. 200, 198 A.2d 273 (1964); *Subsequent Injury Fund v. Pack,* 250 Md. 306, 242 A.2d 506 (1968); *Bd. of Ex. of Landscape, Arch. v. McWilliams,* 270 Md. 383, 311 A.2d 792 (1973); *Maryland Board v. Armacost,* 286 Md. 353, 407 A.2d 1148 (1979); *see also Insurance Comm'r v. Allstate Ins.,* 268 Md. 428, 302 A.2d 200 (1973); *Real Estate Comm'n v. Tyler,* 268 Md. 641, 303 A.2d 778 (1973). In more recent times, however, both this Court and the General Assembly have significantly constrained that doctrine.

As we pointed out in *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 743, 501 A.2d 48, 54 (1985), the *McKinney* doctrine had never been applied to governing bodies or constitutional officers in the Executive Branch of the State Government, and, in that case, we declined to apply it to the Consumer Protection Division of the Attorney General's Office, notwithstanding the lack of any specific statutory authority for the Division to appeal from a reversal or modification of its decision by a trial court. We concluded, in that regard, that the Consumer Protection Division, though clearly exercis-

ing quasi-judicial, adjudicative functions, was "not the kind of non-adversarial, quasi-judicial agency contemplated by *McKinney, Peco* and their progeny." *Consumer Protection,* 304 Md. at 744, 501 A.2d at 55. The Division, we said, exercised a broad range of functions that were closely identified with the execution of public policy, and "[w]ith its many different functions, its mandate to protect consumers and its role as a representative of the interests of the State, the Division is not the type of agency to which the rationale of *McKinney* applies." *Id.* at 746, 501 A.2d at 56. It had a strong interest in the outcome of its case and was therefore aggrieved by the reversal of its order.

The criterion enunciated in *Consumer Protection,* though not conceptually different from that stated in *McKinney,* clearly constituted a refocusing on how the *McKinney* doctrine would be applied. In *McKinney,* we noted that the zoning board *did* have quasi-legislative functions and was charged with studying the zoning laws and municipal development in Baltimore City and making recommendations for changes in the laws. Our view was that those broader functions were essentially subservient to the board's principal function of deciding appeals, special exceptions, and variances, which we treated as more or less exclusively quasi-judicial. The Consumer Protection Division of the Attorney General's Office also performed quasi-judicial functions, and, indeed, the order at issue was entered after a contested case hearing and had a quasi-judicial quality to it. We looked, however, at the broader mission of the agency as one of implementing legislative public policy and regarded that as more important than whether the implementation happened to be in the form of a quasi-judicial determination. As noted, our holding was not based on any specific statutory authority to appeal, as alluded to in *McKinney,* but rather that, with the various policy functions performed by the Division, it was "not the type of agency to which the rationale of *McKinney* applies." *Consumer Protection,* 304 Md. at 746, 501 A.2d at 56.

That shift in focus is now well-established. In *Department v. Bo Peep,* 317 Md. 573, 565 A.2d 1015 (1989), *cert. denied,*

*Cassilly v. Maryland Dep't of Human Resources,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990), we applied the reasoning of *Consumer Protection* to the child care licensing function of the State Department of Human Resources and found standing on the Department's part to appeal the vacation of its decision to revoke Bo Peep's day care license. The role of the Department in that regard, we held, was not "a passive one of quasi-judicial adjudication, but is an active one of policy formulation and protection of children." *Id.* at 586, 565 A.2d at 1021. In *Real Estate Comm'n v. Johnson,* 320 Md. 91, 576 A.2d 760 (1990), we held that the State Real Estate Commission had standing under the *Consumer Protection* analysis to appeal the reversal of its decision denying claims against the Real Estate Guaranty Fund. We confirmed that, absent statutory authority, zoning boards have no interest in the outcome of their decisions but held that the Real Estate Commission, charged with administering the Guaranty Fund, *is* aggrieved by a reversal of its decision on claims against the Fund. We noted as well the rule-making authority of the Commission and its authority to investigate complaints and punish its licensees.

In *Board v. Haberlin,* 320 Md. 399, 404, 578 A.2d 215, 217 (1990), involving an appeal by a county liquor license board from the reversal of its decision to grant an application for the transfer of a beer and wine license, we questioned whether cases strictly applying the *McKinney* doctrine "remain viable in light of our recent cases," although, because there was another party to the appeal with clear standing, we did not need to decide that issue. In *Maryland Racing Com'n v. Castrenze,* 335 Md. 284, 643 A.2d 412 (1994), the Racing Commission disqualified a winning horse on the ground that the trainer was ineligible, because of a suspension in Delaware, to enter the horse. Applying broadly the principles stated in *Consumer Protection,* we found standing on the part of the Commission to appeal from a judgment reversing that ruling. After iterating that the *McKinney* doctrine "does not apply to all agencies or to all adjudicative administrative proceedings," we confirmed again that "under the general

statutory authorizations for appeal, agencies are entitled to appeal from adverse circuit court judgments where the functions of the agencies 'are so identified with the execution of some definite public policy as the representative of the State, that their participation in litigation affecting their decisions is regarded by the Legislature as essential to the adequate protection of the State's interests.' " *Id.* at 294, 643 A.2d at 416 (quoting *Consumer Protection v. Consumer Pub., supra,* 304 Md. at 743, 501 A.2d at 54).

That approach was followed as well in *Board of Liquor v. Hollywood,* 344 Md. 2, 684 A.2d 837 (1996), where we overruled *Liquor License Board v. Leone,* 249 Md. 263, 239 A.2d 82 (1968) (holding that a county liquor license board had no standing to appeal the reversal of its decision) and found standing to appeal. We could have based our decision in *Hollywood* solely on a change in the statute dealing with appeals from Circuit Court judgments in liquor board cases (*id.* at 7–8, 684 A.2d at 840), but we noted as well that the "common law underpinnings" of *Leone* and *McKinney* had evolved and were "now of more limited application." *Id.* at 8, 684 A.2d 837, 684 A.2d at 840. Under the current approach, we said, "we consider characteristics such as the authority to adopt rules, investigate complaints, prosecute violators, and issue orders in furtherance of the public interest in determining whether the *McKinney* limitation on the right to appeal is applicable to an agency." *Id. See also Carroll County v. Lennon,* 119 Md.App. 49, 703 A.2d 1338 (1998) (county ethics commission had standing to appeal trial court decision reversing ruling that appellee violated county ethics ordinance).

This more recent case law recognizes that the principal function of many administrative agencies goes beyond merely resolving disputes in which they have no independent interest and that their contested case adjudicatory function is but one mechanism for carrying out their general responsibility to implement broader legislative policy. The decision in a contested case can often have a significant impact on the ability of the agency to implement that legislative policy and, indeed, on the substance of the policy itself.

■ Although the fundamental precept of *McKinney* has never been expressly overruled, the point of the recent case law is that, when the agency's decision does or can have significance in terms of the agency's broader responsibilities, the confining limitations of *McKinney* are not applicable. In such a case, the agency must be free to intervene in judicial review actions and contest in the appellate courts judgments that may hamper it from effectively implementing the policies ordained by the Legislature.[1]

With this backdrop, we look to the functions of the Calvert County Planning Commission which, as noted, was created pursuant to Article 66B of the Maryland Code and has the powers and duties set forth therein. Section 3.05 of Art. 66B makes it the function and duty of the Commission to develop an overall plan to serve as a guide to the development of public and private property. The plan is to contain a statement of goals and policies for the development and economic and social well-being of the county as well as specific land use, transportation, community facilities, and mineral resource plans. The Commission is to recommend as well zoning boundary lines. Section 3.06 provides that the plan shall be made for the general purpose of guiding coordinated and harmonious development that will best promote health, safety, morals, order, convenience, prosperity, and efficiency, including, among other things, provisions for traffic, public safety, light and air, conservation of natural resources, prevention of environmental pollution, and public utilities.[2]

---

**1.** This common law development has been matched by legislative action. In rewriting the contested case provisions of the Administrative Procedure Act in 1993, the General Assembly expressly declared that an agency subject to that Act that was a party in the Circuit Court may, if aggrieved by a final judgment of that court, appeal to the Court of Special Appeals. *See* Maryland Code, § 10–223(b) of the State Government Article. *See Maryland Racing Com'n v. Castrenze, supra,* 335 Md. 284, 295 n. 4, 643 A.2d 412, 417 n. 4.

**2.** Chapter 426, Acts of 2000, effective as of October 1, 2000, rewrote various sections of Article 66B, including § 3.01, *et seq.* and § 5.01, *et seq.* The Commission's recommendation of boundaries is now found in § 3.06(a), and the general purpose of the plan is found in § 3.05(c).

Apart from their planning responsibilities, planning commissions are given substantial control over the subdivision of land within the county. Section 5.03 directs planning commissions to recommend to the local legislative body regulations governing the subdivision of land within the county. Those proposed regulations are to include provisions for shore erosion control, sediment control, arrangement of streets, placement of public school sites and open spaces for traffic, utilities, fire-fighting apparatus, *and recreation*, light and air, avoidance of population congestion, and minimum lot widths and areas. Section 5.02 of Article 66B provides that, if the county has adopted and certified the transportation element of the commission's plan, a plat of subdivision may not be filed or recorded until the commission, or its authorized designee, approves the plat. Approval of a subdivision plat constitutes an amendment to and part of the plan. § 5.04.

■ It is evident from these provisions that planning commissions do far more than act as neutral arbiters of disputes in which they have no independent interest. They have been charged by the General Assembly and by their respective local legislative bodies with implementing important public policy— with guiding the economic development and public welfare of the county. The approval of subdivision plats is a significant part of that responsibility and involves much more than a dispute between neighboring landowners. In deciding whether to approve a proposed subdivision, the commission must consider whether it conforms to the overall plan and meets both the substantive and procedural requirements established by law. That is unquestionably a function that is "so identified with the execution of some definite public policy as the representative of the State, that their participation in litigation affecting their decision is regarded by the Legislature as essential to the adequate protection of the State's interests." *Consumer Protection, supra,* 304 Md. at 743, 501 A.2d at 54 (quoting *McKinney,* 174 Md. at 561, 199 A. at 545). For this reason, we agree with the Court of Special Appeals that the Commission had proper standing in the Circuit Court. The Commission concluded that the re-subdivision of Recreation

Area B was not in conformance with the substantive and procedural requirements of the law; if a court were to overturn that decision, the Commission's ability to perform its legislatively-mandated role could be adversely impacted.

## *Due Process*

Planning commissions are provided for by §§ 3.01 through 3.09 of Article 66B, although, as noted, some of their duties and responsibilities are specified in other sections of that Article and in implementing local legislation. Section 3.03 provides generally for the organization of the commissions— election of a chairperson, frequency and openness of meetings. That section states that a planning commission "shall adopt rules for transactions of business and shall keep records of its resolutions, transactions, findings, and determinations." [3] At the time this matter was presented to and heard by the Commission, it had not adopted any formal, written rules, at least not any dealing with the reconsideration of an earlier approval of a subdivision. HRM complained about that lack, arguing (1) that the statutory violation alone precluded the Commission from proceeding, and (2) that apart from the statutory violation, the absence of rules dealing with such things as (i) whether the Commission had the power to reconsider a former action, and (ii) if so, who had the burden of proof, what the standard of proof would be, and what procedure would be followed, left it unable to protect its interests and thus deprived it of procedural due process.

As noted, the Court of Special Appeals found no due process violation based solely on the alleged statutory violation but did find such a violation from the absence of procedural guidelines. HRM complains about the first aspect of that ruling, and the Commission complains about the second. Mixed in with their arguments are the more substantive questions of whether, in fact, the Commission had the authority to reconsider its earlier approval and whether it wrongfully applied a

---

3. This language is now contained in § 3.03(c).

preponderance of the evidence standard as the quantum of proof required of the Bennetts.

The Court of Special Appeals determined that there was, in fact, no violation of the statutory requirement to adopt rules, in that the statute did not require the adoption of *written* rules, and some basic rules *were* announced by counsel to the Commission at the commencement of the hearing. We do not agree with that analysis. In directing planning commissions to "adopt rules for transactions of business," we do not believe that the Legislature anticipated *ad hoc* oral rules determined and announced by counsel to the Commission. Rules for the transaction of business by public agencies are intended to be normative principles formally adopted by the agency in written form, in accordance with whatever procedural requirements may apply, and, upon request, made available in advance to persons dealing with the agency. Only then can there be some assurance against arbitrary and capricious conduct on the part of the agency.

The failure of the Commission to have such rules in place *did* constitute a violation of the statutory mandate. That violation, by itself, however, did not constitute a lack of due process or preclude the Commission from proceeding to carry out its public duties. Due process is concerned with fundamental fairness in the proceeding, not with whether the agency has failed in some way to comply with a statutory requirement. *See Maryland State Police v. Zeigler*, 330 Md. 540, 559, 625 A.2d 914, 923 (1993); *also Hyson v. Montgomery County*, 242 Md. 55, 69, 217 A.2d 578, 587 (1966). A statutory violation may, in some instances, suffice to create an unfairness or arbitrariness in the proceeding that would be of Constitutional significance, but the Constitutional deficiency would then be in the effect of the statutory violation, not in the violation itself. The Constitutional issue in this case thus turns on what occurred at the two hearings.

In this regard, our focus is on the three principal complaints made by HRM-the lack of any rule (1) authorizing the Commission to reconsider its earlier approval of the re-subdivision,

(2) determining who had the burden of proof, and (3) establishing the standard of proof.

HRM seems to argue that, in the absence of a rule specifically allowing the Commission to reconsider the earlier approval, it had no authority to do so. That is not the case. We first dealt with that issue in *McKinney*. Although our holding there was that the zoning board had no standing to appeal from the circuit court judgment, and as a result we dismissed the appeal, we nonetheless found it expedient to address some of the substantive issues presented in the appeal for the guidance of the board. One of those issues was whether the zoning board had the authority to reconsider its earlier denial of the application. The only law bearing on that issue was the provision in the ordinance stating that the board may not consider and approve an application for a permit within two years after rejection of an application for a similar permit for the same premises. We framed the issue as follows:

"It may be conceded without discussion that the Board has the right to correct errors in its decisions caused by fraud, surprise, mistake or inadvertence, which any agency exercising judicial functions must have, to adequately perform its duties. Whether it has the right to reconsider its decision in a case which it has heard and decided, reopen the case and try it again, where there is no fraud, mistake, surprise, or inadvertence, is another question."

*McKinney, supra,* 174 Md. at 564, 199 A. at 546. In the particular case, we concluded that there was no basis for reopening the case—no fraud, mistake, surprise, or inadvertence—and, for that reason, we concluded that the action of the board was beyond its power and therefore void. *Id.* at 566, 199 A. at 547. Nothing of significance had changed—although the church had moved from one building to another, it was still within 300 feet of the proposed service station.

In *Kay Const. Co. v. County Council,* 227 Md. 479, 485, 177 A.2d 694, 697 (1962), we construed *McKinney* as essentially requiring a showing of "good cause" to justify the reopening of a zoning case by a quasi-judicial zoning agency. Although we

were dealing there with the reconsideration of a zoning action by the Montgomery County Council, sitting in a legislative capacity, we found the *McKinney* precept instructive. As in *McKinney*, we found no basis for the reconsideration, noting that the Council "did not allege that there was any fraud, surprise, mistake or inadvertence as to the facts which were before it for consideration at the time of its original delibera- tion on the request for rezoning, or as to any other factor, or that any new facts had been developed." *Id.* at 488, 177 A.2d at 699. *See also Md. Clothing Mfg. v. Baltimore,* 207 Md. 165, 113 A.2d 743 (1955); *Redding v. Bd. of County Commr's,* 263 Md. 94, 282 A.2d 136 (1971).

Most instructive is *Schultze v. Montgomery Co. Bd.,* 230 Md. 76, 185 A.2d 502 (1962). The county planning board denied a request to re-subdivide a residential lot on the sole ground that the new lots would not be of substantially the same character as to suitability for residential use as other land within the subdivision. That was a permitted ground under the zoning law for disapproval. The applicant sought reconsideration of that ruling, contending that the board had permitted the re-subdivision of lots within the same subdivi- sion and even on the same block. Eventually, after being advised that the staff had failed to inform the board of the previous re-subdivisions, the board authorized a resubmission of the subdivision plat and approved it. When the applicant submitted a final plan for the two lots, however, several neighbors protested and, after another hearing, the board reversed itself again and disapproved the final plan, assigning the same reason it had relied upon in the initial disapproval— that the lots would not be of the same character as to suitability as other lots in the subdivision. In an action for judicial review, the Circuit Court sustained the board's deci- sion, but we reversed. Applying *McKinney*, we concluded that "while the reversal from the original disapproval to approval of the preliminary plan was based on the existence of mistake or inadvertence, *i.e.,* ignorance of information later supplied by an assistant engineer that there had been resubdi- visions in the same block in which is located the property

under consideration, the disapproval of the final plan amount-
ed to a mere change of mind on the part of the board as it is
apparent from the record that it was not founded upon fraud,
surprise, mistake or inadvertence, or indeed upon any new or
different factual situation." *Schultze,* 230 Md. at 81, 185 A.2d
at 505.

■ These cases make clear that a statute (or rule) ex-
pressly permitting a reconsideration or setting the standard
for reconsideration is not necessary, and that, in the absence
of such a statute, the *McKinney* analysis applies. An agency,
including a planning commission, not otherwise constrained,
may reconsider an action previously taken and come to a
different conclusion upon a showing that the original action
was the product of fraud, surprise, mistake, or inadvertence,
or that some new or different factual situation exists that
justifies the different conclusion. What is *not* permitted is a
"mere change of mind" on the part of the agency.

■ Although counsel for the Commission attempted to
justify the reconsideration here on the ground of some kind of
fraud that was neither civil nor criminal fraud, it is apparent
that the basis of the Commission's decision was simply its
conclusion, founded on substantial evidence, that it had been
misled in 1996 into believing that all existing property owners
in the subdivision had given written consent to the re-subdivi-
sion of Recreation Area B, as required by law, when, in fact,
that was not the case. The substantial allegation of that
defect fully justified the Commission in setting the matter for
hearing, to determine, from evidence, whether a mistake had
been made. Upon a finding that the earlier approval was, in
fact, based on a mistaken belief, induced by the applicant's
representation that proper consents had been obtained, the
Commission was fully justified, under *McKinney* and its prog-
eny, in rescinding that approval.

■ HRM's complaint about the lack of a rule setting forth
who had the burden of proof is likewise without merit. It was
announced at the commencement of the hearing that the
earlier approval was to be presumed correct and that the

Bennetts would have the burden of establishing otherwise, and that, indeed, was the approach followed. Apart from the fact that it was the correct approach, it obviously benefitted HRM, so there was neither error nor harm.

■ Finally, we turn to the complaint regarding the standard of proof. Relying largely on a statement from *Santosky v. Kramer*, 455 U.S. 745, 757, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599, 609 (1982) that "[s]ince the litigants and the fact finder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance," the Court of Special Appeals concluded that HRM asked about and was entitled to know at the outset what the standard of proof would be and that "a proceeding that is conducted without the parties having knowledge of the standard of proof applicable to the fact finder's decision-making is not a fair proceeding and does not comport with due process." Although as a general proposition, that is a correct statement, it does not mandate the result reached by the Court of Special Appeals in this case.

The issue needs to be considered in context. At the outset of the first hearing, on October 15, 1997, HRM complained generally about the lack of written rules, noting "we don't know what to expect; we don't know whether you have the authority under the proper state of irregularity, to come forward tonight to do anything; we don't know what the procedures are; we don't know what the burden of proof is here, is it preponderance of the evidence, is it clear, convincing evidence—I don't know, you want an answer?" Counsel for the Commission responded, "If you want an answer, it's the same answer I gave you today." We assume that counsel had reference to the injunction proceeding heard earlier that day in the Circuit Court, in which, according to counsel for the Bennetts, "the arguments that [HRM] presented were the same arguments that we presented today, in front of Judge Clagett, as the motion was to restrain the Commission from acting on this." Whether, in fact, the standard of proof was resolved in the court proceeding is unclear, as the record in

that case is not before us, but it may well be that the issue was resolved in that proceeding.

As noted, the other procedural uncertainties complained of were resolved at that point—it was agreed that the Bennetts had the burden of proof and that they would proceed first with their evidence regarding the lack of consent, subject to cross-examination and rebutting evidence by HRM. Indeed, that is the way the matter proceeded. At the commencement of the February, 1998 hearing, HRM again complained about the lack of any rules specifying the standard of proof, to which Commission counsel again retorted that the same issue had been presented to the court prior to the first hearing. At the end of the hearing, HRM argued that the standard had to be clear and convincing evidence, because the burden was on the Bennetts to overcome a decision that was presumed to be correct, although counsel cited no authority for that proposition. As we indicated, the Bennetts urged that, whatever the standard was, they had met it. The Commission never ruled upon the matter. It simply found as a fact that the required consents had not been obtained, and that was the sole basis for its decision to rescind the approval.

It is true that there are some factual issues that impinge so directly and significantly on fundamental rights as to require more than mere preponderance of the evidence to resolve adversely to the person affected. *See Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (civil commitment of person to mental institution); *Santosky v. Kramer, supra,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (termination of parental rights); *Woodby v. Immigration Service,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (deportation proceeding); *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 513 A.2d 882 (1986) (allegations of fraudulent or dishonest conduct). The standard of proof normally applicable in civil and administrative proceedings, however, is the preponderance of evidence. *Bernstein v. Real Estate Comm.,* 221 Md. 221, 232, 156 A.2d 657, 663 (1959), *appeal dismissed,* 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960); *Everett v. Balti-*

*more Gas & Elec., supra,* 307 Md. at 301, 513 A.2d at 890. We see no reason why that general standard should not apply in this case. The issue was simply whether the required written consents had been obtained for the re-subdivision of Recreation Area B. No fundamental liberty interests were at stake, and the issue was not really one of fraud, although that word had been mentioned on several occasions.

We cannot tell from this record *what* standard the Commission applied. Even if it applied the lowest standard, however—that of preponderance of the evidence—it would have been correct in doing so. The lack of clarity on that point, therefore, was in no way harmful to HRM. There is no indication that it was, in any way, misled or prevented from producing or challenging evidence that, had the preponderance standard been clearly announced at the outset, it otherwise would have produced or challenged. The only defense it had to the complaint by the Bennetts was to produce evidence that written consents had, in fact, been obtained, and it was unable to do so. The Commission had before it the sworn testimony of the Bennetts and Dickerson that they had *not* consented, the fact that no consents appeared in the Commission file, the testimony of Mr. Barrett that he did not personally obtain any consents, and the testimony of Mr. Jaklitsch that the Commission staff does not check whether all required consents have been obtained but relies instead on the representations of the applicant. On that evidence, the Commission's finding would be readily sustainable whether the standard was preponderance or clear and convincing evidence.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE RULING OF CIRCUIT COURT FOR CALVERT COUNTY DISMISSING THE COMMISSION AS A PARTY BUT TO OTHERWISE AFFIRM THE JUDGMENT OF THE CIRCUIT COURT; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY HOWLIN REALTY MANAGEMENT, INC.