727 A.2d 406

Penny **ABBEY** et al.

v.

The **UNIVERSITY OF MARYLAND, College Park.**

No. 871, Sept. Term, 1998.

Court of Special Appeals of Maryland.

April 8, 1999.

Joel A. Smith (Sabrina Willis and Kahn, Smith & Collins, P.A., on the brief), Baltimore, for appellants.

Dawna M. Cobbs, Asst. Dist. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before DAVIS, EYLER, and SONNER, JJ.

EYLER, Judge.

Penny Abbey and fourteen other appellants,[1] at all times relevant to this appeal, were State employees who worked in the physical plant department at the College Park location of the University of Maryland, appellee. Appellants were designated as essential employees by appellee, and pursuant to policies and procedures relating to emergency situations adopted by the Board of Regents of the University of Maryland System,[2] appellants were expected to report to work regardless of weather conditions. From January 7 to 13, 1996, there was a heavy snowfall in the State of Maryland. On January 8 and 9, Monday and Tuesday, respectively, appellants took one of four actions: (1) some appellants reported to work, (2) some appellants did not report to work and used accrued leave time (sick, vacation, or personal leave), (3) some appellants did not report, and gave prior notice of their absences, and (4) some appellants did not give prior notice of

---

1. The other appellants are Will Allen, Albert Collins, Lucien Dean, Frederick Echols, Keith Henson, Craig Newman, Gary Scott, Paul Sullivan, Joseph Adams, Thomas Barrett, Matthew McCall, Paul Hendricks, Adam Harless, and Robert Ross.

2. The policies and procedures approved by the Board of Regents defined "emergency conditions" in part as "[t]hose conditions which are determined by each campus CEO or designee to be serious enough to warrant the cancellation of classes or the release of employees." The policies and procedures defined "essential employee" as

An employee of a facility who has been designated as vital to the operation of the facility, whose presence is required regardless of the existence of an emergency condition, and whose absence from duty could endanger the safety and well being of the campus population and/or physical plant.

their absences, and were disciplined and not paid for the two days in question.

On February 1, 1996, the Governor's Chief of Staff issued a memorandum, on behalf of the Governor, directed to all cabinet secretaries and heads of independent agencies. The memorandum was entitled, "Weather Related Closing of January 8 and 9, 1996," and announced that all "emergency essential employees" who were unable to report for duty on January 8 and 9 because of weather conditions were "to be granted emergency release time for the period of their absence." The memorandum further provided that contractual State employees would be paid for the two-day closure.

Appellee determined that the Governor's memorandum did not require it to grant administrative leave to appellants, and it did not do so. Appellants filed a grievance on February 5, 1996 and, after it was denied, appealed to the Office of Administrative Hearings. A hearing was held by an administrative law judge ("ALJ") on January 22, 1997, at which exhibits were introduced into evidence. No testimony was presented. The ALJ, in a decision dated August 20, 1997, ruled in favor of appellants and ordered that they be granted administrative leave for January 8 and 9, 1996. The basis of the decision was that the memorandum issued on behalf of the Governor applied to appellants and was binding on appellee. Appellee filed a petition for judicial review in the Circuit Court for Montgomery County. The circuit court, after a hearing on April 20, 1998, reversed the ALJ's decision and ruled in favor of appellee.

## Question Presented and Contentions

The parties each present several questions for our consideration, but they are really in the nature of sub-questions that can best be presented as contentions. The single basic question for our consideration is whether the circuit court erred in reversing the decision of the ALJ.

Appellants first contend that the ALJ found as a matter of fact that the Governor's memorandum was intended to apply

to all State employees. This finding, according to appellants, was supported by substantial evidence, but the circuit court ignored it, conducted a *de novo* review, and concluded that it was not intended to apply to appellants. Appellants conclude that this constituted an error of law because the circuit court failed to apply the correct standard of review to the factual conclusions of the ALJ.

Second, appellants assert that the circuit court, relying on Maryland Code (1997) Education § 12–104, erroneously decided that the Board of Regents of the University of Maryland System has sole authority to create policies governing the University. Appellants assert that this power is limited, that the University must comply with laws of general application, and that the Governor has ultimate authority over appellee. Appellants argue that the Governor's memorandum directly applied to them, and that appellee is bound to comply with the Governor's mandate.

Third, appellants contend that, while appellee's employees are not covered by the State Personnel Management System, they are to be treated in the same manner as those employees, under the Education article, § 12–111(b). With reference to § 12–104, appellants acknowledge that the Board of Regents is given responsibility for the management of the University System, including appellee, but argue that such powers are subject to "any . . . restriction expressly imposed by law." Md.Code (1997) Educ. § 12–104(a). Appellants argue that the provisions contained in Education, § 12–111 constitute such other restrictions. Appellants assert that those provisions prohibit the Governor from disadvantaging appellee's employees *vis-a-vis* classified State employees. Section 12–111(b), as it existed at the time of the administrative proceedings, provided:

> *Classified employees—In general.*—After appointment, employees in positions designated by the University shall be regarded and treated in the same manner as classified service employees of this State and:

(1) Have all rights and privileges of classified service employees;

(2) Have the right of appeal as provided by law in any case of alleged injustice;

(3) Shall be paid salaries not less than those paid in similar classifications in other State agencies; and

(4) Shall retain their vacation privileges, retirement status, and benefits under the State retirement systems.[3]

Md.Code (Supp.1996) Educ. § 12–111(b). Specifically, appellants contend that the leave benefits at issue in this case are within the "rights and privileges" of classified employees under § 12–111(b)(1).[4] In essence, this argument holds that the Governor's memorandum applies to appellants vicariously, through the operation of § 12–111(b).

Appellee responds that the circuit court did not engage in any fact finding but ruled as a matter of law. Second, appellee asserts that, as a matter of law, it was not required to follow the Governor's memorandum. Appellee relies on (1) Education § 12–104, which gives responsibility for management of the University System of Maryland to the Board of Regents, (2) the fact that the Board of Regents has adopted a

---

**3.** The State Personnel and Pensions article and the Education article were revised in 1997. Prior to that revision, employees were generally designated as classified (having merit system protection) or unclassified (generally not having merit system protection). As a result of the revisions, classified employees were designated as either "skilled service" or "professional service" employees. Unclassified employees were designated as "management service" or "executive service" employees. *See* Md.Code (1997) State Pers. & Pens. §§ 6–401 to 6–404 (1997); Md.Code (Supp.1998) Educ. § 12–111.

**4.** The appellants who reported for work on January 8 and 9, 1996 have no basis to assert that the Governor's memorandum applies to them. According to the record, four employees reported for work on both days—Will Allen, Albert Collins, Craig Newman, and Paul Sullivan—and it was the policy of appellee to grant such employees "either a full shift's pay plus compensatory leave or a cash payment equivalent to the paid administrative leave granted non-essential employees." In any event, the memorandum plainly applies to "employees who were unable to report for duty on January 8 and 9, 1996." We therefore affirm the judgment as to these four appellants for this reason.

policy dealing with emergency weather conditions and the release of employees, and (3) the view that the memorandum issued by the Governor's office on its face did not apply to appellants. In connection with the third point, appellee points out that the memorandum expressly referenced procedures that had been revised in October, 1994, and that the University System of Maryland was exempt from those procedures.[5]

With respect to Education § 12–111, appellee points out that subsection (a) acknowledges that the University System of Maryland has an independent personnel system and subsection (c) provides that, subject to subsection (b), the Board of

---

5. The memorandum of February 1, 1996 issued by the Governor's Chief of Staff, Major R. Riddick, provided as follows:

Emergency essential employees who were unable to report for duty on January 8 and 9, 1996, because of the exceptional weather emergency conditions are to be granted emergency release time for the period of their absence. These employees shall not be disciplined for their inability to reach the worksite on the two days in question. This action is taken in response to the unique weather emergency which prevailed during these two days. Whatever action may be appropriate to be taken in response to any future weather emergency will be determined at that time.

Employees must be aware of their individual responsibilities under emergency release conditions. Please make certain that emergency essential employees are identified and notified of their designation. Each agency is also to develop and maintain an agency emergency information system for the purpose of providing information and responding to employee inquiries regarding emergency release conditions. Should future unprecedented weather emergency occur, an emergency essential employee should be required to call in to the agency for instruction prior to the beginning of the employee's shift if circumstances will prevent the employee for reporting in a timely manner. The *Procedures for the Release of State Employees Under Emergency Conditions* (Revised October 1994) will be amended to include this requirement.

We have also received numerous inquiries about the compensation of contractual employees for January 8 and 9, 1996. The recent blizzard was an extraordinary emergency that created situations which warrant compassionate and responsible solutions. Contractual employees, like permanent employees, should not be penalized due to the closure of State offices. Please therefore assure that contractual and temporary State employees are paid for the two day closure as soon as possible. Our review, which included discussions with the Office of the Attorney General, indicated that this action is consistent with Executive Order 01.01.1981.10 which governs emergency release.

Regents shall establish general policies and guidelines governing classified personnel. Appellee argues that if subsection (b) requires that its employees be treated precisely the same as employees in the State Personnel Management System, it would vitiate the authority given to the University System of Maryland in subsections (a) and (c). Consequently, according to appellee, subsection (b)(1) must mean that the University shall provide the same general types of rights and privileges available to State Personnel Management System Classified (now skilled and professional service) employees but that details are within the discretion of the Board of Regents.

## Discussion

■ The proceedings before the ALJ were governed by the Administrative Procedure Act, Maryland Code (1995 & Supp. 1996) State Government article §§ 10–201 to 10–226, *see* Md. Code (1997) Educ. § 12–104(h)(2), which authorizes further review by a circuit court and the Court of Special Appeals. *See* State Gov't §§ 10–222 to 10–223 (1995). This Court reviews the decision of the ALJ, not the decision of the trial court, *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362, 329 A.2d 691 (1974); *Consumer Protection Div. v. Luskin's, Inc.*, 120 Md.App. 1, 22, 706 A.2d 102 (1998), *rev'd in part on other grounds, Luskins's, Inc. v. Consumer Protection Div.*, 353 Md. 335, 726 A.2d 702 (1999), and pays no deference to the legal conclusions of the ALJ. *See* Md.Code (1995) State Gov't § 10–222(h)(3); *Baltimore Lutheran High Sch. v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985); *Maryland Securities Comm'r v. U.S. Securities Corp.*, 122 Md.App. 574, 587, 716 A.2d 290 (1998).

The issue presented in this case is purely one of law. The written decision of the ALJ in this case set forth a *"Findings of Fact"* section containing several enumerated facts. The parties apparently do not contest any of the factual conclusions of the ALJ, or inferences that may have been derived from those facts. The issue presented for our review is simply whether the Governor's memorandum of February 1, 1996, supercedes the employment policy in effect at the Uni-

versity of Maryland College Park, either directly or by operation of Education § 12–111. Appellant asserts that the ALJ made a factual finding relating to the "intent" of the Governor in issuing the memorandum, and that findings with respect to intention are factual findings. None of the ALJ's enumerated factual findings refer to the intent of the Governor in any respect, however, and in the absence of an ambiguity in the language of the memorandum, the subjective intent of the Governor in authorizing the memorandum would be immaterial to the question of its legal effect. We conclude from our review of the written decision of the ALJ that the decision is not based on a conclusion as to the intent of the Governor, but is instead based on legal conclusions as to the effect of the memorandum on Appellants.

The administrative decision in this case apparently makes two legal conclusions, in the alternative, as to the effect of the memorandum: (1) that the memorandum includes designated employees of the University within its scope, and therefore, for the days in question, directly supercedes the subordinate policy of the University with regard to essential employees, and (2) that even if the memorandum covers only certain classified employees of the State within its scope, appellants are entitled to the same "rights and privileges" thereby conferred on those classified state employees by operation of § 12–111 of the Education article. We note that, of these two legal conclusions, the administrative decision appears to present the first conclusion as the primary basis of decision, since the second conclusion is evidenced by a quotation of § 12–111 without a separate discussion of the language or applicability of that section to the appellants. We nevertheless believe that the ALJ concluded that § 12–111 applied to the case in some way, and we will therefore consider appellant's arguments with respect to the applicability of this statute.

The ALJ stated in his written decision, "Such directives by the Governor have precedent (sic) over the policies of the Board [of Regents]. This directive applied to all State emergency essential employees and the Employees involved in this

grievance are State employees and are deemed essential by the University."

■ We conclude, however, that the Governor's memorandum does not include appellants within its scope—it does not mandate by its own terms that they be given emergency release time for January 8 and 9. The memorandum was addressed primarily to "emergency essential employees" and ordered that these employees be given "emergency release time" for their absences from work. The memorandum also mandated that such employees not be disciplined for their absences, and that agency heads and cabinet secretaries notify emergency essential employees of their designation, develop and maintain an agency information system to inform employees about emergency release conditions, and require employees to call their agency for instructions prior to their shifts in the event of an emergency. The memorandum stated that the *Procedure for the Release of State Employees Under Emergency Conditions* ("Procedure") would be amended in accordance with the new requirements.

A review of this Procedure reveals that there are many references to the Procedure in the memorandum. The Governor's memorandum referred to the written Procedure in effect at that time, mandated additional action not required under the Procedure, and stated that the Procedure would be amended as a consequence of changes in the Procedure announced in the memorandum. The terms "emergency essential employee" and "emergency release time" in the memorandum were references to those terms as defined in the Procedure at §§ IV. E. and IV. H., respectively. Action by the Governor was necessary because under § VI. of the Procedure, the authority of the Secretaries of Transportation, Personnel, and General Services to grant release time is limited to one day unless the Governor authorizes a longer period of time. Given this scheme, the operation of the memorandum is clear: it granted a one-time benefit not available as a matter of course under the Procedure, mandated additional agency action not required under the Proce-

dure, and stated that the Procedure would be amended accordingly. The Procedure applied to a class of employees defined in the Procedure and granted a benefit also defined in the Procedure.

The difficulty for appellants is that they are explicitly excluded from the Procedure. Section III of the Procedure provides as follows:

> *SCOPE*
>
> This procedure applies to all agencies in the Executive Branch, EXCEPT the following: educational institutions under the jurisdiction of the University of Maryland System, Morgan State University, St. Mary's College, the Maryland School for the Deaf and Baltimore City Community College.

There is no language in the memorandum that suspends or overrides the maintenance of distinct emergency release policies for the above educational institutions and all other executive departments of the State. Far to the contrary, the memorandum includes many explicit references to the Procedure, including reference to the primary class of employees to be benefitted, "emergency essential employees," which is defined to exclude appellants and other employees of the University System. In light of the existence of entirely separate policies on emergency situations, and the broad autonomy accorded to the Board of Regents, which we discuss below, a reading of the memorandum as applicable to appellee's schools would be extreme and invasive. In addition to granting emergency release time, the memorandum prohibited disciplinary action against absent employees, and dictated new systemic changes for the handling of future emergencies. In particular, under such a reading, the systemic changes to be implemented would apply to appellee under the memorandum, but the corresponding changes to the Procedures would not apply to appellee, as an entity explicitly excluded from that policy. Moreover, granting appellants the requested relief would require a construction of the memorandum that also would force the more invasive instructions contained therein

on appellee, or would require piecemeal enforcement of the memorandum. We reject these tortured constructions in favor of a construction that limits the memorandum to employees subject to the Procedure.

██ We also disagree with the second administrative conclusion, that even if the memorandum covers only classified employees of the State, appellants nevertheless should be granted administrative leave because they are entitled to the same "rights and privileges" of classified state employees under Education § 12–111 of the Education article. We conclude that a one-time grant of emergency release time for emergency essential employees is not a statutorily granted right or privilege of classified service employees, and consequently, that appellants are not entitled to administrative leave under § 12–111.

The term "rights and privileges" is not defined in the Education article. The phrase was first adopted in 1952 as part of the Autonomy Act, which granted broad administrative autonomy to the Board of Regents of the University of Maryland. *See* 1952 Md. Laws Ch. 14; 41 Md. Op. Att'y Gen. 250, 259–60 (1956). As originally enacted, the relevant portions of the Act provided as follows:

(d) Notwithstanding any other provision of law to the contrary, the Board of Regents shall exercise with reference to the University of Maryland, and with reference to every department of same, all the powers, rights, and privileges that go with the responsibility of management, including the power to conduct or maintain such departments or schools in said university and in such localities as they from time to time may deem wise; and said board shall not be superseded in authority by any other State board, bureau, department or commission, in the management of the University's affairs, with the following exceptions:

(1) The right to appoint all employees of the University shall be vested in the University without being in any manner subject to or controlled by the provisions of Article 64A of the Annotated Code, title "Merit System." After

appointment, all employees in positions which are so designated by the University shall be regarded and treated as Classified Employees of the State, *to have all the rights and privileges accorded to Classified Employees under the provisions of said Article 64A.* Such Classified Employees shall have the right of appeal as provided by law in any case of alleged injustice; shall be paid salaries not less than are paid in similar classifications in other State bureaus and departments....

*See* 1952 Md. Laws Ch. 14, § 1 (emphasis added). The qualifying phrase "under the provisions of said Article 64A" does not appear in § 12–111 as it existed in the 1996 supplemental volume to the Education article—the applicable law during the administrative proceedings below. Since its first appearance in 1952, the phrase was retained through several amendments to the statute, and deleted in 1978 when the Education article was created as part of the ongoing code revision process.[6] *See* 1978 Md. Laws Ch. 22, § 2, 39, 309; Md.Code, Educ. § 13–106 (1978). The Revisor's note to the 1978 Code provision states, "This section is new language derived without substantive change from former Article 77A, § 15(e)(1)—except the last two sentences—(1–a), and (7) and the second clause of § 18." Article 77A § 15(e)(1) was substantively identical to (d)(1) in the quoted language above, and, thus, was the source of the phrase "rights and privileges accorded to Classified Employees under the provisions of said Article 64A" immediately prior to the Code revision. *See* Md.Code (1969), Art. 77A § 15(e)(1). The last two sentences of § 15(e)(1), which were deleted in the revision, are irrelevant to the issues of this case. The deletion of these two sentences is the only caveat to the Revisor's statement that the new language is "derived without substantive change"—the new language was collected primarily from former § 15(e)(1), but other parts of new Education § 13–106 also derived from

---

**6.** The Code revision process began in 1971 and continues today under the authority of the State Government article of the Maryland Code, § 2–1238 (Supp.1998).

portions of former § 15(e)(7) and § 18. In short, the deletion of the phrase "accorded to Classified Employees under the provisions of said Article 64A," according to the Revisor of Statutes, was not intended to effect a substantive change in the law.

The Court of Appeals recently considered the intended effect of a deletion from the Code that occurred during the Code revision process. In *Blevins v. Baltimore County*, 352 Md. 620, 724 A.2d 22 (1999), the Court noted in construing the language of § 9–610(a) of the Labor and Employment article that a word had been deleted from the immediately preceding Code provision when that section was rewritten. *See Blevins*, at 635, 724 A.2d 22. The question in that case, as in this case, was whether the Legislature intended to effect a substantive change in the law by deleting the scrutinized term. *Id.* The *Blevins* Court stated:

> We have long recognized and applied the principle that "a change in a statute as part of a general recodification will ordinarily not be deemed to modify the law *unless the change is such that the intention of the Legislature to modify the law is unmistakable." Duffy v. Conaway*, 295 Md. 242, 257, 455 A.2d 955 (1983) (emphasis added); *In re Special Investigation No. 236*, 295 Md. 573, 458 A.2d 75 (1983). That is because the principle function of code revision "is to reorganize the statutes and state them in simpler form," and thus "changes are presumed to be for the purpose of clarity rather than for a change in meaning." *Bureau of Mines v. George's Creek*, 272 Md. 143, 155, 321 A.2d 748, 754 (1974), quoting from *Welsh v. Kuntz*, 196 Md. 86, 97, 75 A.2d 343, 347 (1950).

*Id.*, at 642, 724 A.2d 22. The Court of Appeals considered the fact that the Revisor's note following the recodified section claimed the new language was derived without substantive change from the preceding statute. *Id.* at 643–44, 724 A.2d 22. The Court also relied on a Report that accompanied the Code Revision Bill in that case. *Id.* at 642–44, 724 A.2d 22. The Report stated that the "basic thrust of the revision is formal," and that policy problems uncovered in the revision

process that were beyond the scope of the revision were highlighted in the Revisor's Notes. *Id.* Given this context, the *Blevins* Court concluded that the Legislature did not intend, *sub silentio,* and contrary to the Revisor's Note and the Report, to make a substantive change in the law. *Id.* at 644, 724 A.2d 22.

We arrive at an analogous conclusion on the similar circumstances of this case. In addition to the statement from the Revisor's Note indicating that no substantive change was intended when the reference to section 64A was deleted, the Commission to Revise the Annotated Code prepared a Report to the General Assembly to accompany 1978 Senate Bill 222, which would become the new Education article. The Commission stated in that Report:

> It is to be emphasized that the basic thrust of the Commission's work is formal and not substantive change; the primary purpose of its work is modernization and clarification and not policymaking. Nevertheless, at some points in its work, it becomes necessary to make recommendations which involve the substance of the law. In each case, the Commission has made every effort to assure that its recommendation conforms as nearly as possible to the apparent intent of the legislature and the revisor's notes attached to the appropriate section explain each change made and the reasons for it. All significant changes have been noted carefully in the revisor's notes and are discussed in this report.[7]

■ Without any evidence indicating that a substantive change was intended in the deletion of the reference to § 64A, and in light of the Revisor's Note and Report on Senate Bill 222 to the contrary, we conclude that the Legislature did not intend to broaden the phrase "rights and privileges." Accordingly, the meaning of that phrase is still limited to those rights

---

7. The language pertinent to this case was recodified as § 13–106(b) of the new Education article. Throughout the remainder of the Report there is no discussion of a "significant" change in the language of § 13–106(b).

and privileges that are available to classified employees (now skilled and professional service employees) under the State Personnel Management System.

We need not define the exact scope of such rights and privileges as they exist today, however, because it is clear that the Governor exercised purely executive authority in granting the emergency release time. The memorandum affects only certain employees of the executive branch of State government, and purports to be "consistent with Executive Order 01.01.1981.10" governing emergency release. As we indicate above, the grant of emergency release time in excess of a single day per emergency is purely a matter of gubernatorial discretion. *See* Md. Exec. Order 01.01.1981.10, *reprinted in* 8 Md. Reg.2077. The emergency release time granted to certain classified employees for January 8 and 9, 1996, therefore, is not a right or privilege that appellants are entitled to under § 12–111 of the Education article.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**