918 A.2d 1254

**Julios CINQUE et al.**

v.

**MONTGOMERY COUNTY PLANNING BOARD et al.**

**No. 502, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

March 15, 2007.

350

David B. Fisher, Washington, DC, for appellant.

Stanley D. Abrams, Bethesda, for appellee.

Panel DAVIS, KENNEY and CHARLES E. MOYLAN JR. (Retired, specially assigned), JJ.

KENNEY, J.

The Montgomery County Planning Board of the Maryland–National Capital Park and Planning Commission, appellee,[1] approved a preliminary plan for a subdivision, which was opposed by individual property owners and various organizations, including the Peach Tree Ridge Civic Association, the Boyds Civic Association, and the Audubon Naturalist Society. Representatives of those groups ("the opponents" or "appellants") petitioned for judicial review in the Circuit Court for Montgomery County, which upheld the approval of the preliminary plan. On appeal to this Court, they present two issues:

1. Whether the Planning Board erred in granting Appellee Jamison's request for reconsideration on June 24, 2004, in violation of the Planning Board's Rules of Procedure and the *McKinney* test[.]

2. Whether the Planning Board erred in approving the Thompson Farm Preliminary Plan on November 4, 2004, based on a mere change of mind, in violation of the *McKinney* test[.]

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

This case concerns a parcel of real property in Clarksburg in Montgomery County referred to as the Thompson Farm. As described by the Planning Board:

The Subject Property consists of a total of 434.73 acres and is located within the Ten Mile Creek Area of the

---

1. The Maryland–National Capital Park and Planning Commission is comprised of ten members—five representing Montgomery County and five representing Prince George's County. Md.Code (1957, 2003 Repl. Vol.) § 2–101(a) of Art. 28. The members of the Commission representing Montgomery County also sit as the Montgomery County Planning Board, which is responsible for, among other things, "the administration of subdivision regulations." Art. 28, § 7–111(a).

Clarksburg Master Plan. The property is bordered by Slidell Road to the west and is intersected by West Old Baltimore Road in its southern section. The Subject Property is located west of I-270, Ten Mile Creek and the downtown Clarksburg Town Center. . . .

The Clarksburg Master Plan describes the land within the Ten Mile Creek Area, but west of Ten Mile Creek, as "the most critical in terms of helping to preserve the larger Agricultural Reserve."[2] Clarksburg Master Plan 87 (1994), *available at* http://www.mc-mncppc.org/community/plan_areas/rural_area/master_plans/clarksburg/toc_clark.shtm. The Clarksburg Master Plan further provides:

> The existing land use pattern is dominated by very large parcels and has traditionally been a farming community. Although the suitability of soils for farming varies from poor to good, the importance of this area to County-wide agricultural preservation is significant because it forms a critical transition from the I-270 Corridor to the very productive farmland of western Montgomery County. For this reason, this Plan recommends approximately 1,800 acres west of Ten Mile Creek be added to the County's Agricultural Reserve area.

*Id.* By contrast, with respect to the area east of Ten Mile Creek, the Plan provides: "Because this area is separated from the larger Agricultural Reserve by Ten Mile Creek, agricultural preservation is not the primary objective." *Id.* at 89.

Thompson Farm is zoned "rural density transfer" ("RDT"). The purpose of the RDT zone is to ensure the availability of land for agricultural activities:

---

**2.** The Agricultural Reserve is a large tract of land in Montgomery County for which, through a variety of zoning requirements, "agriculture [i]s the most encouraged use." Functional Master Plan for the Preservation of Agriculture and Rural Open Space in Montgomery County 33 (1980), *available at* http://www.mcparkandplanning.org/community/plan_areas/rural_area/ master_plans/ag_openspace /toc_ag_open80.shtm. Thompson Farm is located within the Agricultural Reserve.

The intent of this zone is to promote agriculture as the primary land use in sections of the County designated for agricultural preservation in the General Plan and the Functional Master Plan for Preservation of Agriculture and Rural Open Space. This is to be accomplished by providing large areas of generally contiguous properties suitable for agricultural and related uses and permitting the transfer of development rights from properties in this zone to properties in designated receiving areas.

Agriculture is the preferred use in the Rural Density Transfer zone. All agricultural operations are permitted at any time, including the operation of farm machinery. No agricultural use can be subject to restriction on the grounds that it interferes with other uses permitted in the zone, but uses that are not exclusively agricultural in nature are subject to the regulations prescribed in this division 59–C–9 and in division 59–G–2, "Special Exceptions–Standards and Requirements."

Montgomery County Zoning Ordinance § 59–C–9.23.

Nevertheless, "one-family detached" dwellings are permitted within the RDT zone. *Id.* at § 59–C–9.3. A minimum lot size of 40,000 square feet is required, but "[o]nly one one-family dwelling unit per 25 acres is permitted." *Id.* at § 59–C–9.41.

Section 50.34(a) of the Montgomery County Code provides that "[e]very proposed subdivision or resubdivision shall be submitted to the [Planning] [B]oard for tentative or conditional approval in the form of a preliminary plan prior to the submission of a subdivision record plat." Once a preliminary plan is submitted to the Board, the Board may approve it, disapprove it, or approve it with conditions. *Id.* at § 50.35(f).

In June 1997, George Spiegle submitted a preliminary plan review application for a subdivision of the Thompson Farm. The proposed subdivision was for seven lots on 176.529 acres. The Maryland–National Capital Park and Planning Commission Development Review Committee ("the Review Committee") recommended approval of the plan, but Spiegle did not

pursue the project further. After Spiegle's death, the property was sold.

In October 2001, the new owner, Charles H. Jamison, Inc. ("the applicant"),[3] submitted a preliminary plan for a subdivision of the Thompson Farm. The plan included seventeen lots on 434.73 acres. The Review Committee again recommended approval of the preliminary plan. The Montgomery County Planning Board ("the Board") held a public hearing on June 27, 2002. At that hearing, representatives of civic organizations and individual property owners opposing the plan argued principally that there would be a shortage of water in the area and that the subdivision would be out of step with the area's agricultural character. The Board approved the preliminary plan with the then Chairman Holmes, Vice Chairman Perdue, and Commissioner Robinson voting to approve; Commissioner Wellington voted against approval.[4]

In an opinion released on December 3, 2002, the Board explained its decision to approve the preliminary plan. The opinion addressed the major concerns of the opponents of the subdivision, including the argument that the subdivision would be out of character with the area. Concluding that the subdivision complied with all applicable zoning regulations, the Board approved the preliminary plan with conditions.

Opponents of the subdivision requested reconsideration of the Board decision on December 13, 2002. They argued that the preliminary plan is inconsistent with the Clarksburg Master Plan, pointing out that the language the Board had quoted from the Master Plan relates to the area east of Ten Mile Creek, and that the proposed subdivision is west of Ten Mile Creek. The opponents contended:

[T]he Opinion contains the following quote from the Clarksburg Master Plan, "Because this area is separated from the larger Agricultural Reserve by Ten Mile Creek, agricultural

---

3. The applicant was later changed from Charles H. Jamison, Inc. to Jamison 427 Land Co.

4. Commissioner Bryant was absent from the hearing.

preservation is not the primary objective. The key land use objective in this area is to provide housing and job opportunities while mitigating water quality impacts in Ten Mile Creek." Petitioners are baffled as to the relevance of this passage. This quote refers to the land *east* of Ten Mile Creek. The Thompson Farm is *west* of Ten Mile Creek, not east. Thus, this passage is entirely irrelevant and cannot serve as a basis for the Board's approval of the Preliminary Plan.

The Clarksburg Master Plan draws a clear and powerful distinction between land *east* of Ten Mile Creek and *west* of Ten Mile Creek. The most significant distinction is that the land use pattern west of Ten Mile Creek is supportive of agricultural preservation. As stated in the Master Plan concerning land west of Ten Mile Creek, "Alternative rural land use patterns were considered in this area but rejected as being inconsistent with farmland preservation objectives."

(Citations omitted.)

The opponents further contended that the planned subdivision would violate the Master Plan in other respects, including the development of agricultural land and the destruction of natural resources. The opponents also highlighted a proposed amendment to the Rustic Roads Plan that would designate Slidell Road, which is adjacent to the proposed subdivision, a rustic road.[5] The opponents contended: "Slidell Road's recommended inclusion into the Rustic Road Program is based on

---

5. The Rustic Roads Functional Master Plan "serves two purposes. The first purpose is to permanently designate some roads in the Study Area as rustic or exceptional rustic. The second purpose is to examine travel needs in the Study Area and establish master plan designations for those roads which carry non-local traffic." Rustic Roads Functional Master Plan 3 (1996), *available at* http://www.mc-mncppc.org/community/plan_areas/rural_area/ master_plans/rustic_roads/rustic_toc.shtm. The possible designation of an adjacent road as rustic is not directly relevant to a proposed subdivision as the Rustic Roads Plan provides: "The rustic roads designation is not intended to affect the use of adjoining land except in the design of access to subdivision. It is also not intended to prevent needed improvements to adjoining land uses or to the roads and bridges themselves." *Id.* at 5.

its natural and agricultural features. Yet, the Board's approval of the Preliminary Plan to construct a cluster development to the east of Slidell Road will degrade these very same features." [6]

On May 1, 2003, the Board voted to reconsider its approval. A second hearing on the preliminary plan was held December 11, 2003. At the hearing, the Review Committee asserted that the preliminary plan satisfies the requirements for development within the zone irrespective of the Board's reference to the incorrect language from the Master Plan, and supported approval of the application. Counsel for the applicant argued that the applicant had never claimed that the property is located east of Ten Mile Creek. He contended that the Board's quoting of an inapplicable portion of the Master Plan was not relevant to whether the preliminary plan satisfied all requirements for approval.

Counsel for the opponents argued that the Master Plan was meant to protect the environmental and agricultural nature of the area at issue. He contended that the planned subdivision would not be in accord with the Master Plan. Other opponents of the subdivision also spoke against the preliminary plan.

By a vote of three to two, the Board denied the application for preliminary plan approval. The then Chairman Berlage, Commissioner Wellington, and Commissioner Robinson voted to disapprove the application; Vice Chair Perdue and Commissioner Bryant voted against the motion for disapproval. In explaining his decision to second the motion for disapproval, Commissioner Robinson stated:

The last time this was before us I supported the development and I am going to change my vote. And the reason I am going to change my vote is based on the ... master plan language.... Now if you look at what the Council did here, ... it is very clear to me that the Council down-zoned this land for the purposes of protecting the agricultural re-

---

6. The opponents also petitioned for judicial review of the Board's approval of the plan. The Circuit Court for Montgomery County remanded the case, at the request of the Board, for reconsideration.

serve.... [B]ecause the master plan specifically refers to this as an important transitional area, in a pattern west of Ten Mile Creek which the County specifically down-zoned and agreeing with the staff that we need to have more aggressive clustering to preserve the open space and the agricultural reserve, I am going to vote against the staff proposal as inconsistent with the ... Clarksburg Master Plan, and as inconsistent with the Rustic Roads Plan, when those two documents are read together.

Commissioner Wellington, who had moved for disapproval of the application, explained:

[I moved to disapprove] in particular because the master plan deals specifically with this area and distinguishes between east and west. And so if you approve this, you really, there is no distinction between the other side, the east just like you are treating this side. So, I think that the master plan made that distinction for a purpose....

In March 2004, the applicant requested reconsideration of the Board's disapproval of the preliminary plan. The applicant argued that the Board had provided inadequate notice prior to revocation of the approval, and that the opponents had not propounded sufficient bases for revocation of the approval. The Board granted the request for reconsideration, and a third hearing on the preliminary plan took place November 4, 2004. The Review Committee again urged approval of the application. Counsel for the applicant argued that the Board may grant reconsideration only if there was "a substantial change in conditions" or the prior decision "was a product of fraud, mistake or inadvertence." Counsel for the applicant asserted that nothing had changed since the Board's original approval of the application, and therefore the reconsideration of that approval and subsequent disapproval of the application were illegal. As to the reference to the inapplicable language from the Master Plan in the Board's initial opinion, counsel called it "essentially a clerical or administrative mistake," which did not warrant reconsideration of the Board's approval.

The opponents argued that the Board's reconsideration of its disapproval of the application was inappropriate. Counsel for the opponents further argued that the planned subdivision would violate the Master Plan "because it does not do enough to preserve land for agricultural uses, which is the primary goal within the agricultural reserve and the RDT zone."

The Board voted to approve the preliminary plan. Vice Chair Perdue, Commissioner Bryant, and Commissioner Robinson voted for approval; Chairman Berlage and Commissioner Wellington voted against approval. Commissioner Robinson explained that he had changed his vote after determining that the preliminary plan does not violate the Master Plan. In an opinion dated April 22, 2005, the Board concluded the preliminary plan satisfied all applicable zoning regulations, and was in accordance with the Master Plan. It further explained that Commissioner Robinson had determined that the decision to disapprove the preliminary plan "was wrong as a matter of law."

The opponents petitioned for judicial review in the Circuit Court for Montgomery County. Jamison 427 Land Co. intervened as a respondent. A hearing was held February 22, 2006. The circuit court concluded that it did not have the authority to review the Board's reconsideration of its prior decision. The court further found, alternatively, that the Board had properly granted reconsideration and approved the preliminary plan. The court's order to that effect was entered on the docket March 24, 2006.

The opponents noted this timely appeal on April 24, 2006.

## STANDARD OF REVIEW

"In this appeal, the role of this court is essentially to repeat the task of the circuit court; that is, to be certain that the circuit court did not err in its review." *Mortimer v. Howard Research & Dev. Corp.*, 83 Md.App. 432, 442, 575 A.2d 750 (1990). Thus, we review the decision of the administrative agency, not the decision of the circuit court. *Abbey v. Univ. of Maryland*, 126 Md.App. 46, 53, 727 A.2d 406 (1999).

We "recognize two standards of review of a decision of a zoning board: one for the board's conclusions of law and another for the board's findings of fact or conclusions of mixed questions of law and fact." *Eastern Outdoor Advert. Co. v. Mayor and City Council of Baltimore,* 128 Md.App. 494, 514, 739 A.2d 854 (1999). As to the Board's factual findings, we must determine " 'whether the issue before the administrative body is "fairly debatable," that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions.' " *Stansbury v. Jones,* 372 Md. 172, 183, 812 A.2d 312 (2002) (quoting *White v. North,* 356 Md. 31, 44, 736 A.2d 1072 (1999); quoting in turn *Sembly v. County Bd. of Appeals,* 269 Md. 177, 182, 304 A.2d 814 (1973)).

In reviewing the board's legal conclusions, however, "our review is expansive, and we owe no deference." *Bennett v. Zelinsky,* 163 Md.App. 292, 299, 878 A.2d 670 (2005). " 'Generally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law.' " *Stansbury,* 372 Md. at 184, 812 A.2d 312 (quoting *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749 (1998)). In reviewing for legal error, we " 'must determine whether the agency interpreted and applied the correct principles of law governing the case and no deference is given to a decision based solely on an error of law.' " *Eastern Outdoor Adver. Co.,* 128 Md. App. at 514, 739 A.2d 854 (quoting *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md.App. 607, 652, 701 A.2d 879 (1997)).

## DISCUSSION

Appellants contend that the Board's grant of the applicant's request for reconsideration was improper, and that the subsequent approval of the preliminary plan was therefore illegal. We note at the outset that the grant of a reconsideration request is interlocutory in nature and is not directly appealable. *Prince George's County v. Bahrami,* 33 Md.App. 644, 646–47, 365 A.2d 343 (1976). On appeal from a final

agency decision, however, the appellate court may review the grant of reconsideration. *Id.* at 647, 365 A.2d 343. We turn, then, to whether the Board's grant of reconsideration was proper.

Maryland, along with the federal courts and the majority of state courts that have addressed the issue, recognizes the inherent authority of agencies to reconsider their own quasi-judicial decisions. *See, e.g., Calvert County Planning Comm'n v. Howlin Realty Mgmt., Inc.,* 364 Md. 301, 325, 772 A.2d 1209 (2001); *Redding v. Bd. of County Comm'rs for Prince George's County,* 263 Md. 94, 111, 282 A.2d 136 (1971); *Schultze v. Montgomery County Planning Bd.,* 230 Md. 76, 81, 185 A.2d 502 (1962); *Miles v. McKinney,* 174 Md. 551, 564, 199 A. 540 (1938); Daniel Bress, Note, *Administrative Reconsideration,* 91 Va. L.Rev. 1737, 1769 (2005). "An agency . . . not otherwise constrained, may reconsider an action previously taken and come to a different conclusion upon a showing that the original action was the product of fraud, surprise, mistake, or inadvertence, or that some new or different factual situation exists that justifies the different conclusion." *Howlin Realty Mgmt.,* 364 Md. at 325, 772 A.2d 1209. The inherent power of reconsideration recognized in the case law applies in the absence of a rule or statute providing for reconsideration. *Id.; Schultze,* 230 Md. at 81, 185 A.2d 502. Where a statute or rule exists, it governs as to the circumstances under which the agency may grant reconsideration. *See Kay Const. Co. v. County Council for Montgomery County,* 227 Md. 479, 485, 177 A.2d 694 (1962) (applying an ordinance providing for reconsideration upon "good cause shown"); Bress, *supra,* 91 Va. L.Rev. at 1767 (observing that, with respect to federal agencies, "a statute or regulation overrides the inherent power default").

Because an agency may grant reconsideration based only on a legally recognized ground, it follows that an agency may not reconsider and reverse a decision based on a " 'mere change of mind.' " *Howlin Realty Mgmt.,* 364 Md. at 325, 772 A.2d 1209 (quoting *Schultze,* 230 Md. at 81, 185 A.2d 502). In

*Kay Const. Co.*, the County Council for Montgomery County had granted a rezoning application, then denied it on reconsideration. An ordinance permitted the Council to grant reconsideration upon a showing of "good cause." *Kay Const. Co.*, 227 Md. at 483, 177 A.2d 694. On appeal, the Court of Appeals determined that the reconsideration request had presented no new evidence or arguments, but merely repeated arguments made at the initial hearing. Thus, the Court concluded that the Council's reconsideration and reversal had not been based on good cause:

> It is apparent that the Council's "plain and simple error of judgment" was in reality a mere change of mind, a shift of majority opinion occasioned by the substitution of a councilman of one conviction for a councilman of another conviction. It is unnecessary that this Court now attempt to enumerate all the varied circumstances which may constitute "good cause shown" under the Zoning Ordinance in question. It is sufficient to conclude, as we do, that mere "change of mind" by substitution for one councilman of another who holds contrary views from those of his predecessor, does not amount to "good cause shown".

*Id.* at 489, 177 A.2d 694.

In *Schultze,* the Montgomery County Planning Board had disapproved a preliminary plan for a resubdivision on the basis that it would be out of character with the original subdivision. After rejecting Schultze's request for reconsideration, the Board learned that its staff had previously failed to inform it that it had already approved resubdivisions within the same subdivision. With the new information in hand, the Board allowed Schultze to resubmit the preliminary plan and approved it. When Schultze presented the final plan, however, the Board rejected it for the same reason it had done so initially.

On appeal, the Court of Appeals determined that there was no applicable regulation providing for reconsideration by the Board, but that the Board had inherent authority to reconsider under *McKinney:* "Since the planning board in the instant

case was acting in a quasi-judicial capacity, and the planning regulations contained no provision concerning reconsideration of decisions, we think the test promulgated in *McKinney* ... is the applicable one to determine the validity of reconsiderations by the board." *Schultze*, 230 Md. at 81, 185 A.2d 502. The Court held that the Board's rejection of the final plan amounted to an impermissible change of mind:

> Applying the *McKinney* test to the facts of the case before us, it seems rather clear that while the reversal from the original disapproval to approval of the preliminary plan was based on the existence of mistake or inadvertence, i.e., ignorance of information later supplied by an assistant engineer that there had been resubdivisions in the same block in which is located the property under consideration, the disapproval of the final plan amounted to a mere change of mind on the part of the board as it is apparent from the record that it was not founded upon fraud, surprise, mistake or inadvertence, or indeed upon any new or different factual situation. . . . In their absence here, we hold that the action of the board in disapproving the final plan was an abuse of its power and void.

*Schultze*, 230 Md. at 81–82, 185 A.2d 502.

In *Howlin Realty Mgmt.*, the Calvert County Planning Commission had approved an application for resubdivision based in part on the Commission's belief that all residents of the subdivision had consented to the resubdivision, which was a regulatory prerequisite. Later, when several residents complained to the Commission that they had not consented, the Commission held a hearing and determined that was, in fact, the case. The Commission rescinded its approval of the subdivision due to the absence of the required consents. The Court of Appeals determined that, even in the absence of a rule or statute providing for reconsideration, the Commission possessed inherent authority to reconsider its decisions. The Court concluded that the Commission had validly reconsidered and reversed its previous decision:

> [I]t is apparent that the basis of the Commission's decision was simply its conclusion, founded on substantial evidence,

that it had been misled in 1996 into believing that all existing property owners in the subdivision had given written consent to the re-subdivision of Recreation Area B, as required by law, when, in fact, that was not the case. The substantial allegation of that defect fully justified the Commission in setting the matter for hearing, to determine, from evidence, whether a mistake had been made. Upon a finding that the earlier approval was, in fact, based on a mistaken belief, induced by the applicant's representation that proper consents had been obtained, the Commission was fully justified, under *McKinney* and its progeny, in rescinding that approval.

*Howlin Realty Mgmt.*, 364 Md. at 325, 772 A.2d 1209.

■ These cases teach that an agency may grant reconsideration in accordance with the statute or rule providing for reconsideration, or, in the absence of such a statute or rule, based on fraud, surprise, mistake, or inadvertence. When a grant of reconsideration is not based on one of the authorized grounds, it may be invalid as a mere change of mind. If, on the other hand, there is a legitimate basis for the reconsideration, the subsequent reversal of the agency's previous decision ordinarily will not be said to have been a mere change of mind.

Here, reconsideration by the Board is governed by section 11 of the Rules of Procedure for the Montgomery County Planning Board:

A. A request to reconsider may only be made by a party of record, must be in writing, and unless waived by the Board for just cause must be received by the Planning Board within 10 days of the date of the final decision. The request must specifically state the basis upon which the requesting party believes the Board's decision should be reconsidered. The Board may review a request to reconsider, provided sufficient grounds are demonstrated. Such grounds may include:

(1) a clear showing that the action of the Board did not conform to relevant law or its rules of procedure; or

(2) evidence indicating that certain pertinent and significant information relevant to the Board's decision was not presented at the public hearing before the Board or otherwise contained in the record, together with a statement detailing why such information was not timely presented; or

(3) such other appropriate compelling basis as determined by the Board.

The fact that a party raises an issue worthy of reconsideration does not itself require the Board to reconsider a prior action.

B. If a request is timely received, staff, without need for formal notice, shall present the written request for reconsideration to the Board during the next possible regular meeting of the Board. Board members may question staff or any interested party then present to clarify points raised in the written request, otherwise testimony need not be received. At such time Board members shall determine whether the written request raises a proper and sufficient basis for reconsideration. Any Board member who:

(1) voted in the majority on the action drawn into question; and

(2) believes an issue warranting reconsideration has been raised, may then move to reconsider the action. If no such member remains on the Board, the motion may be made by the Chairman on his/her own initiative or at the request of any Board member.

C. If a motion to reconsider has been duly adopted, the prior final decision shall become void. Staff will then schedule a new hearing for a subsequent date and time providing all parties of record at least 10 days advance written notice of the new proceeding. The record shall be reopened to allow the Board the opportunity to hear further relevant testimony on any issues involving the subject application. The record of the prior hearing may be incorporated as part of the record of the subsequent public hearing.

D. A request for reconsideration shall not operate to extend any appeals times provided by applicable law.

 In its request for reconsideration, the applicant raised a number of bases for reconsideration. First, the applicant argued that the Board had given inadequate notice of its decision to reconsider its initial approval, and that there had been insufficient bases for the Board to grant that reconsideration request. Specifically, the applicant pointed out that the Thompson Farm is not located in the agricultural preserve and that the Clarksburg Master Plan provides for subdividing in the area. The Master Plan provides that the property at issue is in a "transitional area," in which clustering of lots is permissible. The applicant further argued that the Board's reversal of its original approval violated the change of mind rule. The applicant contended that the Board's disapproval of the preliminary plan was illegal because it effectively established a 25 acre minimum lot requirement, where the zoning regulations provide for a 40,000 square feet minimum in the RDT zone. As a result, the applicant contended that the Board's decision was counter to its intention of preserving open space.

In a supplement to its request for reconsideration, the applicant added that the disapproval of the preliminary plan violated the change of mind rule because it was the result of a new Board member who voted differently than the previous member.[7] Thus, according to the applicant, the Board's reversal was impermissible under *Kay Const. Co.*

At the June 24, 2004 hearing on the request for reconsideration, Commissioner Robinson moved to grant reconsideration, explaining:

---

7. At the June 27, 2002 hearing, Chairman Holmes voted to approve the preliminary plan. At the December 11, 2003 hearing, Chairman Holmes was no longer on the Board and Chairman Berlage, who had not been in the Board at time of the previous hearing, voted to disapprove the preliminary plan. As to the organization of the Board, *see* Md.Code (1957, 2003 Repl.Vol.) §§ 2–101 to 2–122 of Art. 28.

I think, to speak for myself, the Board is divided about this particular matter, which goes to the core of our authority and the scope of our discretion in terms of these types of projects, which are appearing in the Agricultural Reserve, what the standards are, and our authority, if any, to address the preliminary plans of this type in terms of the rule, in areas that are governed by the Ag Reserve and related areas. . . .

Commissioner Robinson also urged the parties to settle the matter. Commissioner Bryant sought clarification for the basis of Commissioner Robinson's motion:

COMMISSIONER BRYANT: Just to make sure I understood what you were saying when you talked in terms of the Board being divided, you were not talking about this case, you were talking about the concept.

COMMISSIONER ROBINSON: The general concept, yes, as is reflected and is before us, or as will be before us if another preliminary plan comes back.

COMMISSIONER BRYANT: Okay.

COMMISSIONER MEREDITH WELLINGTON: I will not support the motion because I don't think that the motion meets the standards of our procedure for reconsideration. Our action did conform to the relevant laws and procedures. There was no change in information; there's no new information that would affect this decision. And there are no other compelling reasons. When we granted reconsideration, we conducted [a] *de novo* hearing of all the facts and reached our decision. So I will not support it.

In its final opinion approving the applicant's preliminary plan, the Board stated:

The Applicant . . . filed a request for reconsideration based, among other things, on its position that the Planning Board's denial implemented a new policy of requiring all lots in the RDT zone to have a minimum of 25 acres which, the Applicant argued, is contrary to the Zoning Ordinance requirements. In order to review and clarify its application of the development standards to the Preliminary Plan, the

Planning Board again agreed to reconsider the Preliminary Plan.

(Footnote omitted).

Clearly, the Board implicitly, if not expressly, concluded that the applicant had met its burden of "specifically stat[ing] the basis upon which [it] believes the Board's decision should be reconsidered." Board Rules of Procedure § 11.A. The applicant had argued that the Board's disapproval of its preliminary plan "did not conform to relevant law or its rules of procedure." *Id.* at § 11.A.(1). The remarks by the Commissioners indicate that their concern was whether their prior decision conformed to the relevant law, and reconsideration was granted for that reason. We are not persuaded that the Board violated its rules in granting reconsideration.

After moving to approve the preliminary plan at the November 4, 2004 hearing, Commissioner Perdue stated: "It is my view now as it has been my view in the prior two cases that this .... proposed development is consistent with our development standards...." Commissioner Robinson added: "I am going to support the motion [to approve] because my previous vote was wrong as a matter of law." Commissioner Robinson further explained that he had determined that the preliminary plan does not run afoul of the Master Plan or the Rustic Road Plan.

The Board issued an opinion explaining its about face:

Having given full consideration to the recommendations of its Staff; the recommendations of the applicable public agencies; the applicant's position; the other evidence contained in the record, which is hereby incorporated in its entirety into this Opinion, the Montgomery County Planning Board finds, with the conditions of approval, that:

a) The Preliminary Plan meets the intent and development standards of the RDT Zone and all other applicable provisions of the Zoning Ordinance. The Planning Board further finds that the proposed residential use is permitted as a matter of right in the RDT Zone.

b) The Preliminary Plan substantially conforms to the recommendations of the Clarksburg and AROS Master Plans. . . .

\* \* \*

n) Commissioner Robinson expressly found that his vote for denial of the Preliminary Plan at the conclusion of the December 2003 Hearing was wrong as a matter of law. Specifically, he found that while there was language in the Clarksburg Master Plan that provided specific recommendations for certain parcels of land, there was no language in the Clarksburg Master Plan that provided for specific recommendations for the Subject Property. He concluded that, under the Clarksburg Master Plan, there were no additional standards for development required of the Subject Property beyond those provided for in the RDT zone. Moreover, he found that all applicable statutory and regulatory provisions as well as all other recommendations of the applicable master plans were satisfied as set forth in the Planning Board's findings.

(Footnote omitted.)

In our view, the Board validly granted reconsideration on the basis that its decision did not conform to relevant law, and reversed its previous decision on the same basis, i.e., "that the proposed residential use is permitted as a matter of right in the RDT zone." We perceive no error or abuse of discretion.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**